UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF **CONNECTICUT**

THE TRAVEL COMPANION, LLC,                    CASE NO. 3:03 cv 0289 (DJS)

            Plaintiff,

    v.

FIRST NATIONAL BANK OF OMAHA,

            Defendant.

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**Prepared** by:

Richard P. Jeffries
KUTAK ROCK LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
(402) 346-6000

and

Calum B. Anderson
Federal Bar No.:  ct07611
DAHAHER, TEDFORD, LAGNESE & NEAL, P.C.
21 Oak Street
Hartford, CT 06106
(860) 247-3666

*DEFENDANT REQUESTS
ORAL ARGUMENT*

01-568859.1

I.    INTRODUCTION

The Plaintiff, The Travel Companion, LLC ("TTC"), says it should receive hundreds of thousand dollars under a contract the Defendant, First National Bank of Omaha ("First National"), never signed.    Not only was the supposed contract at the heart of this lawsuit unsigned, but the parties never prepared an "executed schedule" which would have defined their respective rights and obligations in detail. Because there was no executed schedule, the putative contract could never have gone into effect. If the contract has any meaning, it must be construed according to Nebraska law. Nebraska law does not provide a remedy for the alleged breach of an unsigned and incomplete contract.    TTC's other claims fail for the same fundamental reason: FIRST NATIONAL never promised TTC anything.

First National brought these defects to the Court's attention at the outset of the litigation. The Court denied First National's dispositive motion "without prejudice to renewal at the close of discovery in this matter." *See* Order endorsed on Motion to Dismiss or for Summary Judgment dated June 4, 2003. Discovery has not cured the defects in TTC's claims. Summary judgment is now proper.

II.    ARGUMENT

A.    Summary Judgment Standard

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Lucente v. International Business Machines Corp.,* 310 F.3d 243, 253 (2nd Cir. 2002); *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact.    *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995).

01-568859.1

If the moving party meets its burden, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat the motion for summary judgment or, in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. *AGV Productions, Inc. v. Metro- Goldwyn-Mayer, Inc.,* 115 F. Supp. 2d 378 (S.D.N.Y. 2000). "In a breach of contract action, summary judgment is appropriate where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *Greater Eastern Transport LLC v. Waste Management of Connecticut, Inc.,* 211 F. Supp. 2d 499, 502 (S.D.N.Y. 2002) (citing *Schiavone v. Pearce,* 79 F.3d 248, 252 (2d Cir. 1996)).

> B.   The Unsigned Draft Agreement is Unenforceable Because it is a Mere "Agreement To Agree."

In Nebraska' "[a]n agreement to agree, rather than a complete contract that could simply be memorialized at a later time, is not enforceable." *Cimino v. FirsTier Bank, N.A.,* 530 N.W.2d 606, 615 (Neb. 1995); *Nebraska Nutrients, Inc. v. Shepherd,* 626 N.W.2d 472, 499 (Neb. 2001) ("An agreement to agree is not enforceable in Nebraska."). "A contract is not formed if the parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement." *Hawkins Const. Co. v. Reiman Corp.,* 511 N.W.2d 113, 116 (Neb. 1994). Such agreements do not constitute the complete and final agreement that the parties contemplated would govern the transaction, and they create nothing more than an agreement to negotiate in good faith. *See Maxwell, Inc. v. Kenney Deans, Inc.,* 1999 WL 731846 *5 (Neb. Ct. App. Sep 21, 1999) (Exhibit "A"). *Accord Consumer Incentive Services v.*

---

[1] The putative contract incorporates Nebraska law. *See* Tieger Decl. Ex. A, ~ 10(d). *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.,* 87 F.3d 604, 609 (2nd Cir. 1996) ("Contract clauses which require the application of the laws of other states upon breach or dispute are recognized as proper in Connecticut.").

*Memberworks, Inc.,* 2003 WL 2305623 (Conn. Super. Ct. Dec. 8, 2003) at *4: (Exhibit "B")

("An agreement to agree to a material term at a later time is no agreement at all.")

*Hawkins Const. Co. v. Reiman Corp.* 511 N.W.2d 113 (Neb. 1994) is instructive. In *Hawkins,* "Hawkins Construction Company, acting as a general contractor alleged . . . that Reiman refused to perform . . . work [it] bid upon after [Hawkins] won a [state roads construction] contract." Id. at 115. Reiman submitted a written subcontractor bid to Hawkins proposing to do work on the project in "four groups." Id. Sometime after Reiman's bid was submitted "a ... conversation took place [in which Hawkins] assert[ed] that Reiman's bid was orally modified to include work on only three groups." Id. At trial "[t]he district court for Douglas County sustained Reiman's motion for summary judgment, finding that no contract existed and that material terms of the promise were disputed or remained to be negotiated." Id.

The Nebraska Supreme Court affirmed the grant of summary judgment. Where the putative contract's terms explicitly called for further negotiation, the court held there was no contract:

> Summary judgment would still be appropriate, since, as evidenced by Hawkins' submission of the subcontract agreement, elements of the agreement were left to be decided at a later time. The [trial] court's grant of summary judgment on this cause of action was proper.

*Hawkins Const. Co., 511* N.W.2d at 117.

The draft Agreement, even if signed by all parties, was *by its terms* not intended to be a binding final agreement until the parties executed additional documents. The unexecuted draft Agreement provides that its term did not commence until an executed schedule was in effect:

> 1.     (a)     *Services.*     FNB desires to make certain travel and travel related services and benefits available to its cardholders and has selected Service Provider to provide such travel and travel-related services pursuant to executed schedules between the parties ("Services"). Service Provider shall provide Services set forth on such schedules, which may include providing Services

directly to lists of recipients ("Recipients") that FNB provides to Service Provider in an otherwise agreed upon format.    Service Provider shall return lists of Recipients to FNB.


7.    Term. This Agreement shall be effective upon execution of this Agreement and shall remain effective as long as any schedule is in effect.

(Rule 56(a)(1) Statement ~5) (emphasis added).

First National sent TTC an unsigned draft of a contract lacking the essential terms necessary to establish a valid contractual relationship (Rule 56(a)(1) Statement ~ 4).    It never prepared a "schedule" nor did it execute anything purporting to be a "schedule." (Rule 56(a)(1) Statement 17.)    Because essential terms were lacking, "[a] contract [was] not formed because parties contemplate[d] that something remain[ed] to be done in the future," in this case, negotiating and executing schedules.    *Hawkins Const. Co.,* 511 N.W.2d at 116.    The alleged agreement between the parties "[w]as nothing more than an agreement to agree that was in the initial stages of the negotiation process." *Maxwell, Inc. v. Kenney Deans, Inc.,* 1999 WL 731846 *5 (Neb. Ct. App. Sep. 21, 1999) (Exhibit "A").

The requisite terms of the Agreement needed to be negotiated and set forth in the "executed schedules between the parties" in order for a valid and binding contract to be created. No schedule was ever even drafted, much less "executed." Thus, the draft Agreement was never effective. Summary judgment is appropriate.

C.    The Unsigned Power Point Presentation is not an "Executed Schedule" That Makes the Marketing Agreement Enforceable.

TTC claims that a Power Point presentation the parties jointly drafted constitutes an "executed schedule" contemplated by the draft Agreement. *See* Rule 56(a)(1) Statement 1 8. This document was merely a vessel in which the parties embodied their discussions and

negotiations (Rule 56(a)(1) Statement ⊤ 9) and was never signed by either party. (Rule 56(a)(1)

Statement ⊤ 10).

In this context, the word "executed" means  "si  ed."   *See Northeast Community*

*Development Group v. FDIC,*  948 F. Supp. 1140, 1149 (D.N.H. 1995) (interpreting "executed"

agreement in statutory context to mean "signed"); *see also Black's Law Dictionary*  (7th Ed. 1999)

("executed," said of a document, means "that has been signed");  *Nielsen Const. Co. v. Int'l Iron*

*Products,*  22 Cal. Rptr. 2d 497, 500 (Cal. App. 4 Dist. 1993) ("In other words, a written

agreement is `executed' when all parties sign the agreement . . .").

TTC wants to enforce the draft Agreement. To do so, it must be bound by the terms of

that document.   One of those terms is that "executed schedules" exist that set forth the duties of

the parties.   There are no executed schedules here.   There are no schedules of any kind.   One

document, a Power Point presentation on which the parties recorded their thoughts, is the only

thing to which TTC could possibly turn to save itself. That document falls far short of being an

"executed schedule."   With no schedule in place, the draft Agreement (even assuming it could be

enforced absent FIRST NATIONAL's assent to it) has no effective term and is of no force or

effect.   Summary judgment is proper.

D.    First National Made No Promises to TTC That Could Support TTC's Promissory Estoppel Claim[2]

In Nebraska " . . . the general rule regarding the doctrine of promissory estoppel is that a *promise* which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Hawkins Const. Co.,* 511 N.W.2d at 117 (emphasis added) *(quoting* RESTATEMENT (SECOND) OF CONTRACTS § 90); *See also Rosnick v. Dinsmore,* 457 N.W.2d 793, 799 (Neb. 1990) (In promissory estoppel actions "[the Nebraska] courts [apply] the rule of law stated in the RESTATEMENT (SECOND) OF CONTRACTS § 90[.]"); *Gilbert Central Corp. v. Overland Nat. Bank,* 442 N.W.2d 372 (Neb. 1989); *Bigger v. Fremont Nat. Bank,* 340 N.W.2d 142 (Neb. 1983); *Maxwell, Inc. v. Kenney Deans, Inc.,* 1999 WL 731846 * 4 (Neb. App., Sep. 21, 1999) (Exhibit "A") ("Nebraska follows the Restatement (Second) of Contracts § 90 (1981) with regard to promissory estoppel").

The notes to RESTATEMENT (SECOND) OF CONTRACTS § 90 refers to § 2 of the same Restatement for the definition of the term "promise." RESTATEMENT (SECOND) OF CONTRACTS § 90, (notes referring to comment (a)). The RESTATEMENT (SECOND) OF CONTRACTS § 2 defines a promise as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."

---

[2] As to plaintiff's claim of promissory estoppel, breach of contract and breach of the implied covenant of good faith and fair dealing, [Nebraska] law applies.    *Economu. v. Borg-Warner Corp.,* 652 F. Supp. 1242, 1247 (D. Conn., 1987). "First, Section [10(b)] of the [Draft Marketing] Agreement provides that `[it shall be governed in all respects by the laws of the State of Nebraska].' This choice of law must be given due regard unless the choice of law provision is part of an adhesion contract or the product of fraud, duress, coercion or mistake."    *Economu.,* 652 F. Supp. at 1247.    Moreover, there is apparently no difference between Connecticut and Nebraska law on the `promissory estoppel issue presented.    *See Torringford Farms Assn, Inc. v. City of Torrington,*    816 A.2d 736, 740 (Conn. 2003) (The Connecticut Supreme Court "has recognized, . . . Section 90 of the Restatement Second Contracts (1981) states that *under the doctrine of* promissory estoppel, [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. ")

RESTATEMENT (SECOND) OF CONTRACTS § 2.   Although Nebraska courts have never specifically set forth the elements of a promissory estoppel claim, other courts have uniformly held that a clear and definite *promise* is an essential element of a promissory estoppel.   *See, e.g., Torringford Farms Ass'n, Inc. v. City of Torrington,* 816 A.2d 736, 740 (Conn. 2003) ("A fundamental element of promissory estoppel, . . . is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance"); *Hulse v. First Interstate Bank of Commerce-Gillette,* 994 P.2d 957, 958 (Wyo. 2000) (Elements of promissory estoppel are ". . . a clear and definite agreement"); *Schoff v. Combined Ins. Co. of America,* 604 N.W. 2d 43, 48 (Iowa 1999) ("The following elements [are] essential for recovery under a theory of promissory estoppel ... clear and definite oral agreement").

*Maxwell, Inc. v. Kenney Deans, Inc.,* 1999 WL 731846 * 4 (Neb. App., Sep. 21, 1999) (Exhibit "A"), provides guidance.   In *Maxwell,* Kenny Deans ("Deans") entered into an agreement pursuant to which Maxwell sold eight platted lots to Deans at a price of $15,000 per lot. Id. at * 1. "This was one of a series of agreements between the parties dating back to the late 1960's, all involving development of a housing addition near Scottsbluff, Nebraska." Id. "The parties had developed a pattern under which Deans would contract to buy some of the lots, either with or without an option to purchase more." Id. at *1.   Later, Deans gave notice that he intended to exercise the option to purchase some lots. Id.   Maxwell, in his capacity as president of Maxwell, wrote to Deans, indicating that he believed the option would not be fair to his company and that Maxwell would not perform. Id. at *2.   "Deans reiterated his intention to exercise the option to purchase the lots as described in the original agreement." Id.   Maxwell

then brought an action for declaratory judgment. In his answer, Deans denied that the option was unenforceable and raised the affirmative defenses of promissory and equitable estoppel. Id.

In *Maxwell,* "[t]he record uncontrovertedly showe[d] a pattern of conduct by the parties under which they would enter into tentative agreements and subsequently flesh out the details at a later date." Id. at *5. But even as a custom and practice, the Court held, are insufficient to sustain an estoppel claim: "promissory estoppel cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a contract." *Maxwell, Inc., 1999 WL 731846 at *5 (quoting Keil v. Glacier Park, Inc.,* 614 P.2d 502, 506 (Mont. *1980)).* The Nebraska Court of Appeals ultimately held uncertainty in the terms of the "preliminary agreement" were fatal to the promissory estoppel claim:

> This was nothing more than an agreement to agree that was in the initial stages of the negotiation process. With the uncertainty of the terms of the alleged contract and the mere existence of an agreement to agree on final terms at a later date, the essential element of a clear and unambiguous promise was missing. The absence of the relevant material terms should have put [] Deans on notice that the parties needed to negotiate before finalizing an agreement. The trial court accordingly erred in holding that Maxwell was obligated, pursuant to the doctrine of promissory estoppel, to perform the option agreement.

*Maxwell, Inc., 1999* WL 731846 at *5.

Much like the parties in *Maxwell,* the draft Agreement between First National and TTC was nothing more than "an agreement to agree that was in the initial stages of the negotiation process." *Maxwell, Inc., 1999* WL 731846 at * 5. Because the draft Agreement stated that it was subject to terms set forth in schedules which did not exist, there was "uncertainty of the terms of the alleged contract and ... the essential element of a clear and unambiguous promise was missing." Id. In other words, just as the draft Agreement cannot constitute an enforceable contract, it also cannot serve as the basis of a claim for promissory estoppel. First National is entitled to summary judgment on this claim for relief.

E.    First National Did Not Breach the Implied Covenant of Good Faith and Fair Dealing as a Matter of Law.

First National made no promise and no contract. Not surprisingly, the "duty of good faith and fair dealing" that accompanies promises is not present here. "However, in order for the implied covenant of good faith and fair dealing to apply, there must be in existence a legally enforceable contractual agreement." *Cimino v. FirsTier Bank, 530* N.W.2d *606, 616* (Neb. *1995).*

*Cimino v. FirsTier Bank, 530* N.W.2d *606* (Neb. *1995),* is illustrative.   In *Cimino,* the Ciminos, sellers of a business, sued FirsTier Bank (the "Bank") alleging breach of oral contract to consent to sale of business to a third-party buyer and breach of obligation of good faith and fair dealing. Id.   The *Cimino* court noted "[t]he district court found that [the Bank] could not have breached its duty of good faith because there was no contract upon which to impose liability." Id. at *615-16.*

The Nebraska Supreme Court held that were there was no contractual promise, there was no duty of good faith:

> [I]n order for the implied covenant of good faith and fair dealing to apply, there must be in existence a legally enforceable contractual agreement. In the case at bar, we have held that the Ciminos failed to prove the existence of an enforceable oral contract.   Therefore, as a matter of law, we hold that the district court properly sustained FirsTier's motion for summary judgment as to the Ciminos' implied covenant claim.

*Cimino, 530* N.W.2d at *616.*

Here also there is no contract between First National and TTC. Thus, as a matter of law First National has not given, and therefore cannot breach, the implied covenant of good faith and fair dealing. Summary judgment is appropriate.

F.  **A Mere Breach of Contract Without More is Insufficient To Establish a Violation of the Connecticut Unfair Trade Practice Act (CUTPA).**

TTC alleges a violation of the CUTPA for breach of contract (Filing No. 1). However, the contract contains a choice of law clause. (Rule 56.1(9)(1) Statement at T2).  "Contract clauses which require the application of the laws of other states upon breach or dispute are recognized as proper in Connecticut."  *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.,*  87 F.3d 604, 609 (2nd Cir. 1996). "Undoubtedly, parties to a contract may expressly select the choice of law by which it is to be governed."  *Levine v. Advest Inc.,*  12 Conn. L. Rptr. 240, 1994 WL 41'1228 at *6 (Conn. Super. Ct. 1994). Therefore, "[s]uch a stipulation when made governs the contractual rights of the parties." Id. To the extent the Court finds a contract may exist it must follow Nebraska law.

Even if this Court finds CUTPA applies here, TTC's claim would fail because a simple breach of contract without more is insufficient to establish a violation of the CUTPA.  *See Fleet Electronics, Inc. v. Entrata Communications, Inc.,*  2001 WL 1464730 *1 (Conn. Super. Ct. Nov. 8, 2001) (Exhibit "C"). "To establish a violation of CUTPA₃ the plaintiff must prove that the defendant engaged in an unfair or deceptive act or practice."  *Fleet Electronics,*  2001  WL 1464730 *1 (Conn. Super. Ct. Nov 08, 2001) (citing CoNN. GEN. STAT. § 42-110b(a)).  "[T]he trial courts [of Connecticut] appear to be unanimous in their support of the *position that more than a simple breach of contract, even if intentional, is needed to establish a violation of* CUTPA."  Id. at  * 1 (emphasis added);  *Emlee Equipment Leasing Corp. v.  Waterbury Transmission, Inc.,*  595  A.2d 951, 954 (Conn. Super. Ct. 1991) ("A simple breach of contract,

---

§ "Section 42-110b(c) of the act provides that the courts of this state in construing subsection (a) of § 42-110b shall be guided by interpretations given by the Federal Trade Commission and the federal courts in interpreting the comparable provision of the Federal Trade Commission Act."  *Fleet Electronics, Inc. v. Entrata Communications, Inc.,* 2001 WL 1464730 * 1 (Conn. Super. Ct., Nov. 8, 2001).

even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act") *rev'd* on other grounds, 31 Conn. App. 455 (1993).

To maintain an action for a violation of the CUTPA a plaintiff must allege "substantial aggravating circumstances attending the breach of contact necessary to establish a CUTPA violation, that is whether the plaintiff has alleged in its complaint any acts or practices that arguably meet the tests of unfairness set forth in the so-called cigarette rule or that could be construed to constitute deceptive acts or practices which violate CUTPA." Id.

> The Connecticut Supreme Court reviewed the FTC's cigarette rule, which the court has adopted for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen].

*A.G. Foods, Inc. v. Pepperidge Farm Inc.,* 216 Conn. 200, 215, 579 A.2d 69 (Conn. 1990).

In *Loda Agency, Inc. v. Nationwide Ins. Co.,* 2000 WL 1849865 * 1 (D. Conn. Oct. 10, 2000) (Exhibit "D"),    this  Court found that merely pleading a breach of contract and incorporating it by reference into a CUTPA claim with some legal hot-button words is legally insufficient:

> The Court agrees with Defendant and the vast majority of courts in Connecticut that a simple breach of contract is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth in what respect the defendant's activities are either immoral, unethical, unscrupulous, or offensive to public policy. Inasmuch as Loda has simply incorporated by reference the alleged breaches of contract found in Counts One and Five and fails to set forth exactly how such conduct violates the cigarette rule, the Third and Ninth Counts are hereby dismissed.

01-568859.1

Id. at *4.

In alleging its CUTPA claim, TTC merely incorporates by reference its contract claims and asserts, without elaboration, that First National's discontinuation of discussions with TTC is an "immoral" act:

> Paragraphs 1-12 of the Third Count are hereby incorporated and made paragraphs 1-12 of the Fourth Count as if fully set forth herein.
>
> 13.    The foregoing constitutes a violation of the Connecticut Unfair Trade Practices Act, Connecticut General States § 42-110a, et seq., in that the conduct of the defendant as alleged was immoral, oppressive and unscrupulous, causing substantial injury to the plaintiff.

Complaint (Rule 56(a)(1) Statement at  T2)  TTC's conclusory statements do not satisfy the law. TTC merely "incorporates by reference the breach of contract claim and does not set forth in what respect [First National's] activities [were] either immoral, unethical, unscrupulous, or offensive to public policy."  *Loda Agency, Inc.,*  2000 VVL  1849865 *4 (Exhibit "D").   This is not enough under the statute; TTC's breach of contract claim cannot support an action for a violation of the CUTPA.     Summary judgment is appropriate.


CONCLUSION

TTC has not established and cannot establish claims for breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing or a violation of CUTPA.


01-568859.1

There is no genuine issue of material fact and First National is entitled to judgment as a matter of

law.  TTC respectfully requests the Court grant its Motion for Summary Judgment.

Dated this ℙ·day of February, 2004.

FIRST NATIONAL BANK OF OMAHA,
Defendant


By
    Calum B. Anderson
    Federal Bar No.:  ct07611
    DANAHER, TEDFORD, LAGNESE &
    NEAL, P.C.
    21 Oak Street
    Hartford, CT 06106
    (860) 247-3666
    canderson(a)dtln.com

    and

    Richard P. Jeffries #ct24725
    Kutak Rock LLP
    The Omaha Building
    1650 Farnam Street
    Omaha, NE 68102-2186
    (402) 346-6000

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing

BRIEF IN SUPPORT OF SUMMARY JUDGMENT was sent via United States first-class

mail, postage prepaid, this 2day of February, 2004 to the following:


Gerald P. Sack, Esq.                    Richard P. Jeffries
Sack, Spector & Karsten                 Kutak Rock LLP
836 Farmington Avenue                   1650 Farnam Street
West Hartford, CT 06119                 Omaha, NE 68102



Calum B. Anderson

ttoo-060 xti:6;~-    A

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT.R. OF PRACT. 2E.

Court of Appeals of Nebraska.

MAXWELL, INC., a Nebraska corporation, Appellant,
v.
KENNEY DEANS, INC., a Nebraska corporation, Appellee.

No. A-98-930.

Sept. 21, 1999.

Appeal from the District Court for Scotts Bluff County: ROBERT O. HIPPE, Judge. Reversed and remanded with directions to dismiss.

Robert M. Brenner, of Robert M. Brenner Law Office, for appellant.

Paul E. Hofmeister and Steven C. Smith, of Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, P.C., for appellee.

HANNON, MUES, and CARLSON, Judges.

INTRODUCTION

CARLSON.

*1 Maxwell, Inc., the plaintiff, appeals from a judgment of the district - court for Scotts Bluff County, Nebraska, in which the court held that Maxwell was required, pursuant to the doctrine of promissory estoppel, to sell certain developed lots to Kenney Deans, Inc., the defendant, at a price of $21,000 per lot. For the reasons set forth below, we reverse, and remand with directions to dismiss.

BACKGROUND

On April 26, 1993, the appellee, Kenney Deans, and the appellant, Maxwell, entered into an agreement pursuant to which Maxwell sold eight platted lots to Kenney Deans at a price of $15,000 per lot. This was one of a series of agreements between the parties dating back to the late 1960's, all involving development of a housing addition near Scottsbluff, Nebraska. During those years, the parties had developed a pattern under which Maxwell would file final plats for portions of the . addition and install improvements. Kenney Deans would then contract to buy some of the lots, either with or without an option to purchase more. On some occasions, the price set in the original contract would be increased by agreement to reflect the fact that costs had increased in the interim.

When Kenney Deans took possession of a lot to dig the basement, Maxwell would begin charging interest on the purchase price. After Kenney Deans sold the completed house, Kenney Deans would pay Maxwell the purchase price for the lot, plus interest. The deed on the completed home would be to Kenney Deans, who would deed it to the home buyer, or the deed would be given directly from Maxwell to the home buyer.

The agreement signed in April 1993 contained the following option clause, which is the subject of this litigation:

*Description* : [Maxwell] hereby grants [Kenney Deans] an option to purchase additional lots ... more particularly described on Exhibit "A" attached hereto. The highlighted area is the area the Option pertains to. Both Parties understand and acknowledge that Exhibit "A" is a preliminary plat and the plat is subject to change. Both Parties agree that the option shall be separated into two phases. The first phase shall entitle [Kenney Deans] to purchase one half the number of lots that exist on the final plat, which is currently in the process of being completed. The second phase shall entitle [Kenney Deans to] purchase the remaining lots that exist on the final plat.

*Purchase Price* : The purchase price for phase one shall be the same per lot as specified in paragraph 2 of the foregoing contract, for the lots therein. The purchase price for the lots on which phase two of the option applies, shall be determined when and if [Kenney Deans] exercise[s] the option to purchase the lots in phase one of the option.

Term: The term of phase one of the Option shall be for two years from the date [Maxwell] gives notice to [Kenney Deans] of completion of assessments, streets, and utilities referred to in paragraph 8 in the foregoing contract. The term for phase 2 of the option shall be two years from

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the date of notice of completion of assessments and utilities on lots in phase 1.

*2 *Notice* : [Kenney Deans] agrees that [if Kenney Deans] desires to exercise the option to purchase any of said lots, [Kenney Deans] will give notice to [Maxwell], in writing, stating the lot or lots [Kenney Deans] desires to purchase. Upon notice of [Kenney Deans'] intent to exercise said option, an interest rate shall be agreed upon by the parties.

On August 10, 1994, Maxwell gave notice that the improvements had been completed. On March 22, 1996, Kenney Deans gave notice that it intended to exercise the option to purchase "the following lots: One half of the lots on the new plat map, yet to be designed...." March 12, 1997, Melvin Maxwell, in his capacity as president of Maxwell, wrote to Kenney Deans, indicating that he believed the option would not be fair to his company and that Maxwell would not perform.

On March 22, 1997, Kenney Deans reiterated its intention to exercise the option to purchase the lots as described in the original agreement. On April 2, Maxwell brought an action seeking a declaration that the option agreement was vague, indefinite, ambiguous, and, accordingly, unenforceable. In its answer, Kenney Deans generally denied that the option was unenforceable and raised the affirmative defenses of promissory and equitable estoppel. Kenney Deans also counterclaimed, asking the court to declare the option agreement enforceable and seeking to have Maxwell specifically perform the agreement.

On or about March 9, 1998, Maxwell moved for summary judgment and for jury trial. The trial court denied both motions. With regard to the motion for jury trial, the court held that the "trial of the specific performance counterclaim filed by [Kenney Deans] will resolve all of the issues in controversy raised by the. pleadings."

Trial was held on March 18, 19, and 27, 1998. At the opening of trial, the court announced that the "court has ruled that the motion for summary Judgment was overruled, and therefore the case will go to trial on defendant's counterclaim for a specific performance of a contract." Accordingly, Kenney Deans proceeded to present its case for specific performance. At the close of Kenney Deans' case in chief, Maxwell moved for a directed verdict, which

was denied. Maxwell then rested.

On August 14, 1998, the court entered its order. The court first rejected Kenney Deans' counterclaim for specific performance of the contract, holding that "the uncertainties in the claimed contract ... preclude a decree of specific performance." The trial court also held that equitable estoppel was inapplicable because there was no evidence that Maxwell had misrepresented, concealed, or withheld any material facts.

Nonetheless, the court, pursuant to a theory of promissory estoppel, ordered Maxwell to sell nine lots to Kenney Deans at the modified price per lot of $21,000, a $6,000 increase over the stated contractual price of $15,000 per lot. The court explained this holding was the appropriate equitable remedy because "[b]oth parties will suffer from this decision. That price still does not cover all the costs, and Deans will have 30 days to exercise the option which gives him a choice whether to go ahead with the deal at this additional price."

*3 Maxwell filed the instant notice of appeal on September 11, 1998.

### ASSIGNMENTS OF ERROR

Maxwell makes eight assignments of error, which we have restated as follows: The trial court erred (1) in denying Maxwell's request for trial by jury; (2) in denying Maxwell's motion for directed verdict; (3) in granting relief on the basis of Kenney Deans' affirmative defense of promissory estoppel, after having directed that trial be held on Kenney Deans' counterclaim of specific performance; (4) in entering a decree of specific performance on the theory of promissory estoppel; (5) in creating a contract for the parties; (6) in "granting specific performance to an option contract to land which is subject to control or completion by third parties ....;" (7) in failing to find that Kenney Deans failed to give timely and proper notice of its intent to exercise the option; and (8) in finding that the option contract was divisible or severable.

### STANDARD OF REVIEW

A suit for declaratory judgment is an action sui generis and may involve questions of law or equity or both; whether it is treated as an action at law or

Copr. 0 West 2003 No Claim to Orig. U.S. Govt. Works

1999 WL 731846                                                                          Page 13
(Cite as: 1999 WL 731846, *3 (Neb.App.))

one in equity is determined by the nature of the dispute. *Lone Cedar Ranches v. Jandebeur,* 246 Neb. 769, 523 N.W.2d 364 (1994).

In an appellate review of an action for declaratory judgment in an equity action, the standard of review for an equity case applies. *State ex rel. Spire v. Northwestern Bell Tel. Co.,* 233 Neb. 262, 445 N.W.2d 284 (1989). In an appeal from a declaratory judgment, an appellate court, regarding questions of law, has an obligation to reach its conclusion independent from the conclusion reached by the trial court. *Bentley v. School Dist. No. 025,* 255 Neb. 404, 586 N.W.2d 306 (1998).

An action for specific performance sounds in equity. *Winberg v. Cimfel,* 248 Neb. 71, 532 N.W.2d 35 (1995); *Fritsch v. Hilton Land & Cattle* Co., 245 Neb. 469, 513 N.W.2d 534 (1994). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Winberg, supra; University Place-Lincoln Assocs. v. Nelsen,* 247 Neb. 761, 530 N.W.2d 241 (1995).

ANALYSIS
SPECIFIC PERFORMANCE

The trial court found that Kenney Deans was not entitled to an order requiring Maxwell to specifically perform the purported option contract. We agree. The threshold requirement for specific performance is the existence of a valid, legally enforceable contract. *Sayer v. Bowley,* 243 Neb. 801, 503 N.W.2d 166 (1993). As the trial court found, the purported contract was lacking in specificity as to precisely which lots were to be covered by the purported option contract and also left open the responsibility for method of payment and amount and calculation of interest. It also left open the price to be paid for lots purchased pursuant to the second `` half of the option agreement. The trial court held, and we agree, that this lack of specificity was fatal to any claimed contract.

*4 [F]or a binding contract to result from an offer and acceptance, the minds of the parties must meet

at every point; nothing can be left open for future arrangement.... "[A] contract for the transfer of real property is valid and enforceable if the agreement contains the essential elements of a contract with sufficient certainty and definiteness as to the parties, property, consideration, terms, and time of performance."

*Sayer,* 243 Neb at 805, 503 N.W.2d at 169.

Upon our de novo review, we conclude that the trial court was correct in finding that no valid contract existed between the parties and therefore was also correct in holding that specific performance was inapplicable in this case. We next address the issue of whether the trial court was correct in holding that promissory estoppel applied in this case.

PROMISSORY ESTOPPEL

Before proceeding further, we first make a clarification of terminology. The trial judge described the order entered as being one of "specific performance on theory of promissory estoppel. " This phrase constitutes an unfortunate blending of terminology that has apparently generated confusion in this case. As discussed above, the trial court had previously held, in the first part of its opinion, that the lack of a valid contract between the parties made the equitable doctrine of specific performance inapplicable in this case. The theory applied by the trial court in the second part of its order was that of promissory estoppel, pursuant to which the trial court held that Maxwell was obligated to perform according to the promise it allegedly made to Kenney Deans. It was not an order premised upon the equitable doctrine of specific performance.

"Promissory estoppel" is a situation involving a promise by one party upon which another relies to his detriment, and which the promisor should reasonably have foreseen would cause the promisee to so rely. *Farmland Service Coop, Inc. v. Klein,* 196 Neb. 538, 244 N.W.2d 86 (1976). Nebraska follows the Restatement (Second) of Contracts § 90 (1981) with regard to promissory estoppel. *Yankton Prod. Credit Assn. v. Larsen,* 219 Neb. 610, 365 N.W.2d 430 (1985). The Restatement, *supra* at 242, provides as follows:

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and

Copr. 0 West 2003 No Claim to Orig. U.S. Govt. Works

which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Stated another way, a cause of action for promissory estoppel is based upon a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee which does in fact induce such action or forbearance. *Goff-Hamel v. Obstetricians & Gyns., P.C.,* 256 Neb. 19, 588 N.W.2d 798 (1999). The general rule regarding the doctrine of promissory estoppel is that " '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise....' " *Rosnick v. Dinsmore,* 235 Neb. 738, 748, 457 N.W.2d 793, 799 (1990), quoting the Restatement, *supra.* Accord *Whorley v. First Westside Bank,* 240 Neb. 975, 485 N.W.2d 578 (1992).

 *5 The trial court found that Maxwell had promised to offer one-half of the option lots, either at the contractual price or at a mutually adjusted price, and that this promise included a promise to plat and install utilities in substantially the same form as was shown in the sketch attached to the proposed contract. Accordingly, the trial court held that Maxwell was promissorily estopped from refusing to sell the lots.

We disagree, on the basis that no promise was made for promissory estoppel purposes. It is well established in Nebraska law that promissory estoppel does not require that the promise giving rise to the cause of action must be so comprehensive in scope as to meet the requirements of an offer that would ripen into a contract if accepted by the promisee. *Hawkins Constr. Co. v. Reiman Corp.,* 245 Neb. 131, 511 N.W.2d 113 (1994); *Whorley, supra; Rosnick, supra.* But it does require, at the threshold, an appropriate promise.

 Not all words of promise rise to that level. The Restatement, *supra, §* 2(1) at 8 defines a promise as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." However, the Restatement further

provides:
   Words of promise which by their terms make performance entirely optional with the "promisor* whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Although such words are often referred to as forming an illusory promise, *they do not fall within the present definition of promise.*

(Emphasis supplied.) Id., comment *e.* at 10. See, generally, 4 Richard A. Lord, Williston on Contracts, § 8:5 at 96 (4th ed.1992) ("it is clear that a promise is necessary, and that a mere statement of opinion or future intent will not sustain the action"). See, also, *Keil v. Glacier Park, Inc.,* 188 Mont. 455, 462-63, 614 P.2d 502, 506 (1980) ("[p]romissory estoppel cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a contract"). That is precisely the situation in this case. The record uncontrovertedly shows a pattern of conduct by the parties under which they would enter into tentative agreements and subsequently flesh out the details at a later date. This was nothing more than an agreement to agree that was in the initial stages of the negotiation process. With the uncertainty of the terms of the alleged contract and the mere existence of an agreement to agree on final terms at a later date, the essential element of a clear and unambiguous promise was missing. The absence of the relevant material terms should have put Kenney Deans on notice that the parties needed to negotiate before finalizing an agreement.

 The trial court accordingly erred in holding that Maxwell was obligated, pursuant to the doctrine of promissory estoppel, to perform the option agreement. We therefore reverse, and remand with directions to dismiss.

## MAXWELL'S REMAINING ASSIGNMENTS OF ERROR

 *6 Our findings above make it unnecessary to address Maxwell's remaining assignments of error, and we decline to do so. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *Kelly v. Kelly,* 246 Neb. 55, 516 N.W.2d 612 (1994).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1999 WL 731846
(Cite as: 1999 WL 731846, *6 (Neb.App.))

Page 15

CONCLUSION

 For the reasons set forth above, we reverse the decision by the district court for Scotts Bluff County, and remand with directions to dismiss, with prejudice,  Maxwell's  petition and Kenney Deans' counterclaim.

 REVERSED     AND     REMANDED     WITH DIRECTIONS TO DISMISS.

 1999 WL 731846, 1999 WL 731846 (Neb.App.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

E,cG~,'b;~   (3

Not Reported in A.2d                                                        Page 1
(Cite as: 2003 WL 23025623 (Conn.Super.))

H
Only the Westlaw citation is currently available.


UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.


Superior Court of Connecticut,
Judicial District of Fairfield.

CONSUMER INCENTIVE SERVICES
v.
MEMBERWORKS INCORPORATED.

No. CV990362655.

Dec. 8, 2003.

Zeldes Needle & Cooper, Bridgeport and Brody
Wilkinson & Ober PC, Southport, for Consumer
Incentive Services.

Diserio Martin Oconnor & Castiglion, Stamford,
for Memberworks Incorporated.


WOLVEN, J.

*1 By Amended Complaint dated May 15, 2000,
the Plaintiff, Consumer Incentive Services
International, Inc. (CISI), alleges that the
Defendant, Memberworks, Incorporated (MW)
breached various agreements whereby the
Defendant agreed to compensate the Plaintiff for
business opportunities the Plaintiff introduced to the
Defendant (Counts One, Two and Five). The
Plaintiff, also asserts claims of anticipatory breach
(Count Three); unjust enrichment (Counts Four and
Seven); promissory estoppel (Count Six); and
violations of the Connecticut Unfair Trade Practice
Act (Counts Eight and Nine).

As a result, the Plaintiff alleges that it has suffered
harm and seeks monetary and equitable relief from
the court, including, inter alia, money damages,
punitive damages, attorneys fees, costs and interest.
The Defendant denies these claims essentially for
the reason that an enforceable agreement ever
existed between the two parties. This matter was
tried before this Court in December 2002 and

January 2003. By agreement of the parties trial
briefs and reply briefs were submitted prior to
Closing Arguments which were heard by this Court
on November 17, 2003.

Facts

The Defendant, MW, formerly known as
Cardmember Publishing Corp. (CPC), is a
publically traded corporation, which provides
membership service programs. These programs are
sold by MW to customers of banks and other
finance-related companies, retail merchants, utilities
and other consumer-related industries which send
monthly bills. The Plaintiff, CISI, is a closely held
corporation which provides consumer-related
consulting, marketing, program design and sales
services. In addition, it assists other marketing
companies in targeting and obtaining new clients as
a broker.

David Swanson (Swanson), President of CISI, was
first introduced to MW in the late summer, 1996,
when, James Duffy (Duffy), Chief Financial Officer
of MW and an acquaintance of Swanson, asked
Swanson to forward him information concerning
CISI. Prior to discussions between MW and CISI
concerning a working relationship, Swanson
forwarded a Non-Disclosure and
Non-Circumvention Agreement (Ex. E) to Duffy,
which was intended to protect their mutual interests.
Similarly, MW forwarded a confidentiality
agreement to CISI (Ex. D). Each of these
documents were signed by representatives of the
parties.

Subsequently, there were discussions between MW
and CISI concerning possible business
opportunities. Over the course of the next few
months, CISI introduced a number of potential
clients to MW, some of whom formed connections
with MW; some of whom did not. Swanson wrote to
Martin Donner (Donner), Senior Vice President of
MW, on July 10, 1997, "in advance of a more
formal agreement between our companies," and
identified accounts that CISI brought in to MW.
(Exhibit N.) In a letter dated July 31, 1997 ('Exhibit
P), Donner acknowledged to Swanson that these
companies were introduced to MW by CISI, and
agreed that MW would not market directly to any of
these accounts. As to CISI's compensation, MW
was to pay a fee "to be determined on a 'case by
case' basis for any net revenue derived from these

Copr. ~) West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                    Page 2
(Cite as: 2003 WL 23025623 (Conn.Super.))

relationships." Included on the list was Coverdell & Company (Coverdell), a prospective client that CISI first introduced to MW, although CISI did not have an independent business relationship with Coverdell.

*2 Additional correspondences concerning the Coverdell prospect were exchanged between CISI and MW during the summer of 1997. In a letter dated August 8, 1997 (Exhibit S), Donner documented a schedule of royalty payments that CISI would receive relative to three specific products that MW hoped to sell wholesale [FN1] to Coverdell. In a "wholesale" transaction, MW would provide the product to the client, who would pay MW a fee for the product. The client would be responsible for the cost and risk of marketing the product. CISI's royalty payments would be based on net revenue to MW. This schedule was subsequently modified (Exhibits T, Z and GG); a final agreement concerning royalty payments never materialized.

> FN1. Martin Donner's sole responsibility at MW was developing wholesale business; Swanson worked with Donner to create wholesale opportunities for MW, from which, if successful, CISI would derive a commission. (Tr. 1/8/03 pp. 75-77.) The Plaintiffs complaint, T 6, also describes CISI's responsibilities regarding MW as locating customers to whom MW could sell its programs on a "wholesale basis." While CISI contests that "wholesale" business was the focus of its relationship with MW, the weight of the evidence supports the defendant's position that the parties were working towards establishing wholesale business.

Donner and Swanson met with Michael Levinson (Levinson), CEO of Coverdell, in July 1997, in Atlanta, Georgia, to discuss business opportunities between MW and Coverdell. Prior to the meeting Swanson forwarded a "Confidential Memo" to Donner, which outlined Coverdell's background, business activities and management, for the purpose of preparing Donner for the meeting. Swanson received the information contained in the memo from Dan Berman, a Coverdell consultant, who also acted as a broker to CISI in giving it business leads. A second meeting was held in August 1997,

between MW, CISI and Coverdell, in Omaha, Nebraska. Gary Johnson (Johnson), President of MW, was present at this meeting, and expressed dismay that MW's Merger and Acquisition department had not previously connected with Coverdell.

Swanson understood at that time that MW considered Coverdell an acquisition candidate. (Tr. 1/7/03, p. 5.) Later that summer he had a conversation with Jim Duffy, CEO of MW, concerning MW's acquisition of Coverdell, as well as possible acquisition of CISI by MW. (Tr. 12/18/02, p. 56.) Although Swanson was fully aware that MW considered Coverdell an acquisition candidate, he did not discuss with MW how CISI's interests in the Coverdell/MW relationship would be impacted by such a merger; nor did Swanson send MW correspondence outlining CISI's right to compensation should Coverdell be acquired by MW. None of the documents [FN2] exchanged between CISI and MW prior to the acquisition of Coverdell contemplated or discussed in any way the impact the acquisition would have on the Coverdell account.

> FN2. The documents on which the plaintiff bases its breach of contract claims are the Non-Circumvention and Non-Disclosure Agreement of June 1996 (Exhibit E); the letter of July 10, 1997, identifying protected accounts (Exhibit N); the letter of July 31, 1997 identifying the "protected" companies (Exhibit P); and the letter of August 8, 1997, which sets forth CISI's royalty fee schedule pertaining to Coverdell. (Exhibit S.)

Following the August meeting Swanson continued his efforts to effectuate a business relationship between MW and Coverdell. Swanson forwarded information to Levinson concerning MW services, and the pricing of MW programs which were expected to be marketed by Coverdell. (Exhibit U.) Swanson also attended a meeting on September 26, 1997, in Stamford, Connecticut, involving MW and Coverdell. An agreement between MW and Coverdell was executed on October 1, 1997, whereby MW agreed to supply its membership programs to Coverdell clients for specified fees.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                                           Page 3
(Cite as: 2003 WL 23025623 (Conn.Super.))

On April 2, 1998, prior to MW receiving any revenue from its wholesale relationship with Coverdell, the defendant acquired all the outstanding common stock of Coverdell, for 18.4 million dollars ($18,400,000.00). (Exhibit KKK, p. 14.) [FN3] Because the acquisition preceded any sales by MW to Coverdell, CISI never received royalty fees related to Coverdell. The nature of the business relationship between MW and Coverdell dramatically changed following Coverdell's acquisition. While a "wholesale" arrangement was contemplated by the October 1, 1997 agreement, following acquisition, MW was responsible for the cost and risk of marketing the products it sold through Coverdell. Further, the client fee arrangement changed, as did the number and types of products sold by MW through Coverdell.

FN3. While press releases (Exhibits 23, MM and NN) indicate that Coverdell was acquired for 17.1 million dollars in cash and MW common stock, this court credits MW's Annual Report for 1998, which states that Coverdell was acquired for 18.4 million dollars. (Exhibit KKK.)

*3 Subsequent to the acquisition, Swanson forwarded an e-mail to Duffy and Johnson congratulating MW on the Coverdell Acquisition. Swanson continued his business relationship with MW. In July 1998, Swanson forwarded a "Draft Agreement" to MW in which proposed terms and conditions of their association were documented. (Exhibit 10.) Paragraph 6 of this agreement articulates a schedule of commissions to which CISI would be entitled should MW acquire or merge with a company introduced to MW through the efforts of CISI. A number of revisions were exchanged between the two companies; however, a formalized agreement was never executed.

*Discussion*
Breach of Contract

The gravamen of the plaintiffs claim is that a number of separate correspondences and agreements exchanged between MW and CISI constituted a contract whereby MW was required to compensate CISI for any revenue received by MW through the sale of its products through Coverdell. The plaintiff claims that the defendant breached this

contract, and that CISI is entitled to damages.

"The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence." (Internal quotation marks omitted.) *Avon Meadow Condominium Assn., Inc. v. Bank oj Boston Connecticut,* 50 Conn.App. 688, 695, 719 A.2d 66, cent. denied, 247 Conn. 946, 723 A.2d 320 (1998). To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. See Ubysz *v.* DiPietro, 185 Conn. 47, 51, 440 A.2d 830 (1981); *Augeri v. C.F. Wooding* Co., 173 Conn. 426, 429-30, 378 A.2d 538 (1977); *Cavallo v. Lewis, 1* Conn.App. 519, 520, 473 A.2d 338 (1984). "To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties." *Bridgeport Pine Engineering Co. v. DeMatteo Construction Co.,* 159 Conn. 242, 249, 268 A.2d 391 (1970). If the minds of the parties have not truly met, no enforceable contract exists. See *Fortier v. Newington Group, Inc.,* 30 Conn.App. 505, 620 A.2d 1321 (1993). "[A]n agreement must be definite and certain as to its terms and requirements." (Internal quotation marks omitted.) Id . "So long as any essential matters are left open for further consideration, the contract is not complete." 17A Am.Jur.2d, Contracts § 32 (1991).

The evidence in this case fails to demonstrate a mutual understanding of the terms and requirements between CISI and MW concerning the Coverdell account. The plaintiff bulwarks its position on several correspondences which were exchanged between MW and CISI in 1996 and 1997. These letters identify "protected clients," and potential commission rates; however, taken together they evidence an attempt by the parties to reach agreement; not an integrated agreement pertaining to Coverdell. In the July 10, 1997 letter authored by Swanson to identify protected accounts (Exhibit P), Swanson writes: "since we are moving fairly rapidly with sales efforts on behalf of MemberWorks, and in advance of a more formal agreement between our companies, I have prepared a list of the new accounts to date that CISI has brought into MemberWorks."

*4 Critical issues were never resolved between the parties concerning Coverdell, i.e., the schedule and rate of compensation was in flux during the

Not Reported in A.2d                                                                    Page 4
(Cite as: 2003 WL 23025623 (Conn.Super.))

negotiations; the duration of the contract was undefined; the specific responsibilities of each were not addressed. "An agreement to agree to a material term at a later time is no agreement at all." *Lizotte v. Enfield,* Superior Court, Judicial District of Hartford/New Britain at Hartford, Docket No. 367352 (August 31, 1999, Sheldon, J.). Perhaps, under the circumstances, the most essential term, the effect of MW's acquisition of Coverdell, was left open and never acknowledged in any of the documents which the plaintiff argues constitute an enforceable contract. Swanson was fully aware early in the negotiations between Coverdell and MW, that MW wanted to purchase Coverdell. This acquisition would alter the business structure and organization between Coverdell and MW, · and consequently, CISI arrangement with MW as to the Coverdell account. Nonetheless, Swanson remained silent on this issue, "presuming" (Transcript, 12/19/02, p. 34) that CISI would receive a fee on all net revenue MW derived from Coverdell. The court finds this position untenable.

The parties did not have a "meeting of the minds" concerning essential matters relating to their agreement relating to Coverdell. Accordingly, an enforceable contract did not exist between CISI and MW as to the Coverdell account. Even, arguendo, had these correspondences comprised a contract, the evidence does not support that it was breached. The payment of commission to CISI was premised on wholesale transactions which never transpired between MW and Coverdell; accordingly, compensation was not due to CISI based on any purported agreement.

The plaintiff argues vigorously in its Reply Brief that the defendant breached the November 21, 1996 Non-Disclosure and Non-Circumvention Agreement (Exhibit B), by "usurping" the Coverdell opportunity. The Non-Disclosure and Non-Circumvention Agreement states:

   I. CISI and CPC shall provide each other with information about the Programs. The parties shall also furnish each other with copies of appropriate marketing information which is sent under separate cover for review to detennine the feasibility of their participating in the Programs in a manner which is yet to be determined.
   2. CISI and CPC hereby agree to respect the proprietary and confidential nature of the other · parties' Programs themselves, and of all the documents and information, including the names

of business referrals and contacts, that are or will be provided and shall keep such information confidential, and shall treat such information as proprietary to the providing party. Both parties shall not reveal any such information to any person nor in any other way utilize or permit utilization of the concept of such information of documents without the other's prior written consent.
   3. CISI and CPC agree not to circumvent the efforts of each other, and maintain complete confidentiality with respect to each others' clients, prospects, suppliers, business referrals and contacts, and related parties.
*5 4. Both CPC and CISI shall take reasonable actions to ensure that their partners, employees, agents and associates shall comply with the confidentiality specified in this Agreement and shall indemnify and hold each other harmless for any losses or damages resulting from any such person's failure to keep the information specified herein confidential.

Arguing that the courts have been staunch in upholding non-circumvention agreements, the plaintiff cites *Eden Hannon & Co. v. Sumitomo Trust & Banking* Co., 914 F.2d 556 (4th Cir.1990). In that case, the defendant, a potential investor of the plaintiff, signed a "Non-disclosure and Non-circumvention" agreement which specifically required that the potential investor "not to independently purchase lease transactions" with Xerox's PAS Program "for a period equal to the tenn of the Purchase Agreement." The court found that the defendant breached this specific provision of the Non-circumvention agreement by independently bidding on the Xerox program.

So too, in *Cura Financial Services v. Electronic Payment Exchange, Inc.,* 2001 WL 1334188, * 1 (Del.) (2001), a second case cited by CISI, the defendant committed through contract not to "deal with Cura's confidential bank sources without Cura's permission, and would not otherwise circumvent Cura in dealing with Cura's bank sources." *Id. at* 1. Despite this agreement, and subsequent instructions by the plaintiff to "stay away" from its bank, the defendant forged a relationship with the plaintiffs bank, without permission from or compensation to the plaintiff. The court found this a clear violation of the Non-Circumvention Agreement. In both the above cases, the Non-circumvention Agreements prohibited specific actions on the part of the

Copr. **J** West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                Page 5
(Cite as: 2003 WL 23025623 (Conn.Super.))

defendants; prohibitions which were which were subsequently ignored by the offending party. In both cases, the court found the Non-circumvention Agreements to be valid contracts, which had been breached.

The terms of the Non-Circumvention agreement in this case, however, are nebulous. The provision applicable to the plaintiffs claims is paragraph 3, which merely proscribes "circumventing" the efforts of the other. [FN4] Circumvention is not defined in this agreement; nor are specific actions constituting "circumvention" identified in the agreement, as in the other cases cited by the plaintiff. Certainly, "acquisition" is not prohibited in this agreement. The agreement is silent as to compensation. Moreover, business with or acquisition of Coverdell was not considered at the time the Non-Circumvention Agreement was signed in 1996; accordingly, these contingencies could not have been contemplated by the parties. Swanson, himself, agreed with this proposition. This document is too ambiguous to support the plaintiffs claims for commissions on Coverdell sales.

> FN4. Claims based on the Non-Disclosure portion of the agreement were ruled out of the case by this court, Melville, J., on a Motion to Strike (April 25, 2000).

"In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning ... A contract is unambiguous when its language is clear and conveys a definite and precise intent ... The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity ... Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) B & D Associates, Inc. v. Russell, 73 Conn.App. 66, 71, 807 A.2d 1001 (2002). The plaintiff cites a dictionary definition of "circumvent" in its reply brief, [FN5] however, this definition provides little insight into the parties' intention. For example, does circumvent in this agreement mean deceive; victimize; muffle; rebuff; to turn one's back? "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." United Illuminating Co. v.

Wisvest-Connecticut, LLC 259 Conn. 665, 670, 671, 791 A.2d 546 (2002). A contract is rendered ambiguous if the intent of the parties is not clear and certain from the language of the contract. Id., citing Levine v. Massey, 232 Conn. 272, 278-79, 654 A.2d 737 (1995). If any ambiguity should exist, "[e]vidence concerning the intention of the parties may be found in the conduct and language of the parties and the surrounding circumstances." Geddie v. Cadle Co., 49 Conn.App. 265, 271, 714 A.2d 678 (1998).

> FN5. "Circumvent" means, among other things, to deceive, trick, dupe, bamboozle, hornswaggle, string along, put something over, slip one over on, pull a fast one on, betray, leave in the lurch, holding the bag, double- cross, cheat on, two-time, outmaneuver, outsmart, evade, get out of, give one the run-around, throw off the scent, outwit, outsmart, get the better of, stonewall, elude, give the slip, pull a fast one, make a fool of, make a sucker of, victimize, cut the ground from under one, tie one's hands, and clip the wings of, to keep away from avoid, bypass, dodge, duck, escape, eschew, get around shun, keep (or stay) (or steer) clear of, to pass around but not through, circumnavigate, detour, go around, skirt, to avoid fulfilling or answering completely, sidestep, to get away from (a pursuer), lose, shake off, slip, throw off, give someone the shake (something requiring an outlet) in check, choke back, hold back, hold down, hush (up), muffle, quench, repress, smother, squelch, stifle, strangle, suppress, to slight (someone) deliberately, rebuff, snub, spurn, close (or shut) the door on, give someone the cold shoulder, give someone the go-by, turn one's back, Roget's International Thesaurus, 4th Edition (1977); Roget's II: The New Thesaurus, Third Edition, 1995.

*6 The actions and communications of the parties surrounding the Coverdell acquisition do not support the plaintiffs position that this transaction violated the terms and purpose of the Non-Circumvention Agreement. Prior to the initiation of this lawsuit, there is no documentary

Copr. C West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A. 2d                                                                                  Page 6
(Cite as: **2003 WL 23025623 (Conn.Super.)**)

evidence to suggest that the plaintiff considered MW's acquisition of Coverdell a breach of the Non-Circumvention Agreement, or that MW "usurped" an opportunity of CISI. Swanson was aware of this potential in the early stages of, and throughout, the negotiations with Coverdell. Nonetheless, there were no conversations or correspondence in which Swanson articulated opposition or the position that such actions would be contrary to the Non-Circumvention Agreement. Nor, were there negotiations between the parties to address the contingencies should MW acquire Coverdell.

Swanson, in the summer of 1998, addressed the acquisition, indirectly, in his draft agreement (Exhibit 10) wherein he provides for a finder's fee, *not* continued commissions, should a company he introduced be acquired. (Emphasis added.) The court does not credit the plaintiffs testimony that based on the Non-Disclosure and Non-Circumvention Agreement, CISI was entitled to commissions on Coverdell-related sales for as long as revenue was derived. The terms of the Non-Circumvention' Agreement are too vague and imprecise to mandate that outcome. "When more than one meaning can be given language in a contract, the language is to be construed against the party who drew it, see *Sturman v. Socha,* 191 Conn. 1, 9, 463 A.2d 527 (1983), in this case CISI. For these reasons the court finds that the Non-Circumvention Agreement does not constitute an enforceable agreement between these parties requiring MW to pay CISI commissions on revenue MW derived from Coverdell.

Based on the above, this court fords that the plaintiff has not met its burden of proving that the various correspondences (Exhibits N, P or S), or the Non- Circumvention Agreement were enforceable contracts which were breached by the defendant. The court, therefore, finds in favor of MW on the First, Second, and Fifth Counts.

Anticipatory Breach

"An anticipatory breach of contract occurs when the breaching party repudiates his duty before the time for performance has arrived." *Martin v. Kavanewsky,* 157 Conn. 514, 518-19, 255 A.2d 619 (1969); *Koski v. Eyles,* 37 Conn.Sup. 861, 862, 440 A`:2d 317 (1981). Because the court finds that an enforceable contract did not exist between the plaintiff and defendant concerning the Coverdell

account, the plaintiff cannot prevail on a claim of anticipatory breach. Accordingly, the court finds for the defendant on Count Three of the complaint.

Unjust Enrichment

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another ... With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard ... Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment ..." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Meaney v. Connecticut Hospital A.ssn.,* Inc., 250 Conn. 500, 525, 735 A.2d 813 (1999). See also *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 282-83, 649 A.2d 518 (1994); *Fitzpatrick v. Scalzi,* 72 Conn.App. 779, 786-87, 806 A.2d 593 (2002).

*7 Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff. *National CSS Inc. v. Stamford,* 195 Conn. 587, 597, 489 A.2d 1034 (1985). "Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract ... Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment. Not unlike quantum meruit, it is a doctrine based on the postulate that it is contrary to equity and fairness for a defendant to retain a benefit at the expense of the plaintiff." (Citation omitted; internal quotation marks omitted.) *Gagne v. Gaccaro,* 255 Conn. 390, 401, 766 A.2d 416 (2001).

In this case the court finds that the defendant, MW, was benefitted through the work and efforts of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d

(Cite as: **2003 WL 23025623 (Conn.Super.))**

**plaintiff,** CISI, who should have been compensated for those efforts. The relationship between the plaintiff and defendant was established to foster new business opportunities which would be of "mutual benefit of all parties hereto." (Exhibit E.) Swanson introduced MW to Coverdell; acted as an intermediary during the negotiations; secured information concerning Coverdell which he provided to MW; and attended meetings around the country between MW and Coverdell. The court finds that these actions were central to MW's acquisition of Coverdell. Swanson did not initiate discussions between Coverdell and MW out of the goodness of his heart; he expected monetary gain for his efforts. Moreover, MW viewed Coverdell's acquisition as an "exceptional strategic fit" (Exhibit BBBB); clearly beneficial to it. (See also Exhibit 24.)

Under these circumstances the court finds that the defendant's failure to compensate the plaintiff for introducing and fostering this valuable business opportunity was unjust and wrong. MW argues that the only basis for compensation contemplated between the parties was commissions on wholesale business; accordingly, the plaintiff is just out of luck. The court finds this position harsh and the absence of any remuneration a detriment to the plaintiff. The purpose of the doctrine of Unjust Enrichment is to avoid this type of result. The plaintiff is entitled to be compensated by an amount commensurate with the benefit which accrued to the defendant. See: *Hartford Whalers Hockey v. Uniroyal Goodrich Tire, supra* at 285.

The plaintiff argues that a percentage of the revenue derived from Coverdell sales is a proper measure of the benefit MW derived from the acquisition of Coverdell. The court disagrees. Firstly, .the plaintiffs calculations do not take into consideration the 18.4 million dollars that MW paid to acquire Coverdell. Secondly, the corporate structure and dynamics between MW and Coverdell dramatically changed after the acquisition, as did the accounting procedures; accordingly, the court does not find the various methods employed by the plaintiff to determine commissions an accurate reflection of the defendant's "benefit." The true benefit to MW was Swanson s "discovery" of Coverdell which led to the acquisition. This cdmports with Johnson's statement that his own Acquisition Department should have explored the Coverdell prospect. In addition, the draft agreement

forwarded by Swanson to MW, dated July 4, 1998, incorporates a provision for a "Finder's Fee." Each party recognized the value to MW of locating Coverdell. Moreover, Swanson, in this draft agreement, provided that compensation in such situations would be a finder's fee, rather than commissions based on inter-company transactions. [FN6]

> FN6. In its original complaint, Count Two asserted that MW breached contractual obligations owed to CISI under the confidentiality agreement when it failed to compensate CISI as the broker who introduced MW to Coverdell. This court, Melville J., granted the defendant's Motion to Strike Count Two, noting that the plaintiff did not allege an agreement to pay such a fee; accordingly, the count was legally insufficient. The prior ruling does not preclude this court from determining that the finder's fee is the proper measure of damage as to the defendant's unjust enrichment.

\*8 Walter C. King, an accredited business appraiser, with a CPA, MBA and expertise in forensic economics, testified on behalf of the plaintiff. The court credits his testimony that the Lehman Formula is utilized within the industry to establish fees for bringing companies together. The Lehman Formula is a sliding scale fee whereby the finder is entitled to 5% of the first million of purchase price; 4% of the second million of purchase price; 3% of the third million of purchase price; 2% of the fourth million of purchase price, and 1 % of every dollar thereafter. (Transcript, 1/8/03, pp. 160-61.)

In this instance, MW purchased Coverdell for 18.4 million dollars. Based on the Lehman Formula, the fee to which CISI is entitled is $284,000.00. While Mr. King applied statutory interest to his calculation, from thirty days after the acquisition, the court does not find interest to be justified in this situation. Presumably, Mr. King was employing Connecticut General Statute § 37-3a, which applies an interest rate of 10 per cent a year as damages "for the detention of money after it becomes payable." The court does not find this statute applicable to the facts in this case, where the court

Copr. CC) West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                                                                          Page 8
(Cite as: 2003 WL 23025623 (Conn.Super.))

is awarding compensation based on equitable principles, rather for the detention of money by the defendant after it became payable. Based on the above analysis, the court finds in favor of the plaintiff on Counts Four and Seven.

### Promissory Estoppel

In Count Six, the plaintiff alleges that the Non-Disclosure and Non-Circumvention Agreement constituted a promise by MW that it would not utilize confidential information or circumvent the efforts of CISI as to Coverdell. Further, CISI justifiably relied on this promise and is now entitled to enforce it. "The doctrine of promissory estoppel is derived from the Restatement of Contracts § 90, which provides in relevant part: 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.' ... Promissory estoppel provides an alternative that allows enforcement of a promise even without the usual indicia of conventional bargained for consideration ... The doctrine serves as a consideration substitute to allow enforcement of contracts whereby one party has detrimentally relied on an express or implied promise even though traditional bargained for legal detriment is not present ... Promissory estoppel, therefore, is not a separate cause of action available to plaintiffs, but rather serves to allow enforcement of an otherwise validly formed contractual commitment that lacks traditional consideration." (Citations omitted.) *Pavliscak v. Bridgeport Hospital,* 48 Conn.App. 580, 592-93 n. 5, 711 A.2d 747, cert. denied, 245 Conn. 911, 718 A.2d 17 (1998).

*9 "Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief, and the other party must change its position in reliance on those facts, thereby incurring some injury ... It is fundamental that a person who claims an estoppel nitst show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any

reasonably available means of acquiring knowledge." (Internal quotation marks omitted.) *Chotkowski v. State,* 240 Conn. 246, 268, 690 A.2d 368 (1997).

The court is not persuaded that the doctrine of promissory estoppel is applicable to these facts. Firstly, the court has already determined that the Non-Disclosure and Non-Circumvention Agreement was not an enforceable contract. Moreover, the defendant made no representations to the plaintiff concerning the effect of the acquisition of Coverdell. Swanson did not use due diligence to determine this effect and cannot now claim that he did not know the relationship between MW and CISI would be altered by the acquisition. For these reasons the court finds for the defendant on Count Six.

### CUTPA

In Counts Eight and Nine the plaintiff asserts that the actions of the defendant violate the Connecticut Unfair Trade Practices Act. Connecticut General Statute § 42-110a et seq. provides a private cause of action to "any person who has suffered an ascertainable loss of money or property, real or personal, as a result of the use or employment of a prohibited method, act or practice."

"[I]n determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons] ... All three criteria do not need to be satisfied to support a finding of [a violation of CUTPA]." (Internal quotation marks omitted.) *MaCOnlber v. Travelers Property & Casualty* Co7p., 261 Conn. 620, 644, 804 A.2d 180 (2002). "It is well settled that whether a defendant's acts constitute ... deceptive or unfair trade practices under CUTPA, is a question of fact for the trier ..." (Internal quotation marks omitted.) *Tanpiengco v. Tasto,* 72 Conn.App. 817, 819, 806 A.2d 1080

Copr. Z West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                                                    Page 9
(Cite as: 2003 WL 23025623 (Conn.Super.))

(2002).

In *Associated Investment Co. Ltd. Partnership v. Williams Associates IV,* 230 Conn. 148, 645 A.2d 505 (1994), Justice Palmer emphasized that the Connecticut Unfair Trade Practices Act should be interpreted broadly, and noted that "the expansive language of CUTPA does not require proof of intent to deceive, to defraud or to mislead." Id. at 158. Despite the statute's liberal interpretation, this court does not find that the defendant's actions rose to the level of a CUTPA violation. While a breach of contract can constitute a CUTPA violation, the majority of Superior Courts have held that a breach of contract does not violate CUTPA unless there are substantial aggravating circumstances. *Digicom, Inc. v. AR Robinson Printing,* No. CV00-00736295, 2002 Ct.Sup. 14150 Superior Court Judicial District of Ansonia- Milford at Milford (Nov. 5, 2002, Cutsumpas, J.). In this case, the evidence does not support that there was a breach of an enforceable contract. Moreover, Swanson was fully aware of the possibility that MW would acquire Coverdell; yet, he never pursued discussions with MW concerning the effect of such a merger on his interest in the Coverdell account.

*10 The plaintiff cites several cases which it argues provide support for finding a CUTPA violation in this case. In *Ostrowski v. Avery,* 243 Conn. 355, 703 A.2d 117 (1997), the plaintiff claimed a violation of fiduciary duty by a corporate officer, who had fonned a new corporation. The Supreme Court held that where a defendant's fiduciary duty is established, the burden shifts to the defendant to demonstrate that a beneficial transaction was "fair, in good faith and for adequate consideration ..." Id. at 362. A second case cited by the plaintiff, *Fink v. Golenbock,* 238 Conn. 183, 680 A.2d 1243 (1996), involved claims by a physician that another physician in his corporate practice breached his fiduciary duty by misusing funds. *Larsen Chelsea Realty Co. v. Larsen,* 232 Conn. 480, 656 A.2d 1009 (1995), also addressed allegations of breach of fiduciary duty by a former corporate president, as well as claims against the company who subsequently hired him. In that case, the Supreme Court ordered a new trial holding that anti-competitive activities by a prior fiduciary and the company who subsequently hired him constitute activities under CUTPA. In *Larsen,* the plaintiff alleged that the defendant disseminated false and injurious information concerning it. The court finds

the plaintiffs attempts to equate the policy considerations and facts of these cases with the issues here unpersuasive. The only other policy consideration argued by the plaintiff is the "heavy handed treatment of a small business by a large, publically traded entity." (Brief, p. 16.) While the plaintiff was perhaps a smaller entity, it was experienced as "a national provider of consumer related consulting, marketing and sales services ..." (Exhibit 1.)

This case involves a dispute concerning whether or not the plaintiff should receive commissions for sales occurring after MW purchased Coverdell. The defendant's actions were not "immoral, unethical, oppressive, or unscrupulous"; nor, were there substantial aggravating circumstances sufficient to invoke CUTPA in a contract context. Lastly, evidence of a violation of public policy is lacking; the parties merely disagree. The plaintiffs have not proven their CUTPA claim. [FN7] For these reasons the court finds in favor of the defendant on Counts Eight and Nine.

    FN7. While discussions during settlement negotiations on December 21, 1998 were admitted at the time of trial, the court has determined that such discussions are inadmissible and has not considered them in its decision. The test for admitting statements made during settlement discussions "is whether the party making the admission intended to concede a fact hypothetically for the purpose of effecting a compromise, or to declare a fact really to exist." *Evans Products Co. v. Clinton Building Supply, Inc.,* 174 Conn. 512, 517, 391 A.2d 157 (1978). The statements allegedly made at this meeting were not concessions of fact.

Conclusion

As discussed above, the plaintiff has not met its burden of proving that the parties entered into an enforceable contract concerning the Coverdell account, or that the defendant breached a contract. Nor, did the plaintiff meet its burden of proof on the claims of Promissory Estoppel or CUTPA. Accordingly, the court finds in favor of the defendant on Counts One, Two, Three, Five, Six,

Copr. D West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2003 WL 23025623 (Conn.Super.))

Eight and Nine.

The court does find that the defendant benefitted through the actions of the plaintiff, who, unjustly, was not compensated for those actions, to CISI's detriment. The plaintiff proved by a preponderance of the evidence that it is entitled to restitution under the theory of Unjust Enrichment. The court awards the Plaintiff $280,000.00; statutory interest to commence on the date of judgment.

2003 WL 23025623 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXti: 6: ~  C_

Not Reported in A.2d                                                                                    Page 24
(Cite as: 2001 WL 1464730 (Conn.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.

FLEET ELECTRONICS, INC.,

ENTRATA COMMUNICATIONS, INC.

No. CV000072315S.

Nov. 8, 2001.

MEMORANDUM OF DECISION

JON M. ALANDER, Judge.

*1 The defendant has filed a motion to strike the
third count of the plaintiff's revised complaint on the
grounds that it fails to state a claim upon which
relief can be granted. Specifically, the defendant
asserts that the third count asserting a violation of
the Connecticut Unfair Trade Practices Act
(CUTPA), General Statutes § 42-110a, et seq., is
deficient because it fails to allege anything more
than a simple breach of contract by the defendant.
For the following reasons, the court agrees with the
defendant.

"The purpose of a motion to strike is to contest the
legal sufficiency of the allegations of any complaint
to state a claim upon which relief can be granted. In
ruling on a motion to strike, the court is limited to
the facts alleged in the complaint. The court must
construe the facts in the complaint most favorably to
the plaintiff." (Citations - and internal quotation
marks omitted.) *Novametrix Medical Systems v.
BOC Group, Inc.,* 224 Conn. 210, 214 (1992).

The plaintiff's complaint alleges that the defendant
failed to pay the plaintiff for certain electronic
components which it received from the plaintiff. The
defendant asserts that the third count of the
plaintiff's revised complaint should be stricken
because its claim is limited to a mere breach of
`contract. The defendant argues that a simple breach
of contract without more is insufficient to establish a
violation of CUTPA.

To establish a violation of CUTPA, the plaintiff

must prove that the defendant engaged in an unfair
or deceptive act or practice. General Statutes § 42-
110b(a). Section 42-110b(c) of the act provides that
the courts of this state in construing subsection (a) of
§ 42-110b shall be guided by interpretations given
by the Federal Trade Commission and the federal
courts in interpreting the comparable provision of
the Federal Trade Commission Act. The federal
courts have held that "a simple breach of contract,
even if intentional, does not amount to a violation of
the Act; a [claimant] must show substantial
aggravating circumstances attending the breach to
recover under the Act ..." *Bartolomew v. S.B.
Thomas, Inc.,* 889 F.2d 530, 535 (4th Cir.1989).
See also *Boulevard Associates v. Sovereign Hotels,
Inc.,* 72 F.3d 1029, 1038- 39 (2nd Cir.1995), and
*United Roasters, Inc. v. Colgate-Palmolive Co.,* 649
F.2d 985, 992 (4th Cir.1981).

Although there are not as yet any Connecticut
appellate court decisions on this precise issue, the
trial courts in this state appear to be unanimous in
their support of the position that more than a simple
breach of contract, even if intentional, is needed to
establish a violation of CUTPA. [FN1] See e.g.
*Emlee Equipment Leasing Corporation v. Waterbury
Transmission, Inc.,* 41 Conn.Sup. 575, 580, 3
Conn. L. Rptr. 711 (1991), rev'd on other grounds,
31 Conn.App. 455 (1993); and *Talbot v. Kirkup,*
Superior Court, judicial district of New London,
Docket No. 551986 (September 20, 2000)
(Corradino, J.). The pivotal question therefore is
whether the plaintiff has alleged in its complaint the
"substantial aggravating circumstances" attending
the breach of contact necessary to establish a
CUTPA violation, that is whether the plaintiff has
alleged in its complaint any acts or practices that
arguably meet the tests of unfairness set forth in the
so-called cigarette rule [FN2] or that could be
construed to constitute deceptive acts or practices
which violate CUTPA. [FN3]

> FN1. A computer search of Connecticut Superior
> Court cases on this issue revealed sixty-two
> decisions holding that a simple, albeit intentional,
> breach of contract was insufficient to demonstrate a
> violation of CUTPA. No cases were uncovered
> which asserted the contrary view.

> FN2. The cigarette rule was first established by the
> federal trade commission and has been adopted by
> the Connecticut Supreme Court as the criteria for
> establishing whether a particular actor practice is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(Cite as: 2001 WL 1464730, * 1 (Conn.Super.))

unfair under CUTPA. The criteria of the cigarette rule are as follows: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers competitors or other businessmen. *Jacobs v. Healey Ford Subaru, Inc.,* 231 Conn. 707, 725 (1995). See also *Conaway v. Prestia,* 191 Conn. 484, 492-93 (1983)

FN3. In *Caldor, Inc. v. Heslin,* 215 Conn. 590 (1990), the Connecticut Supreme Court established that three requirements must be met in order to find that an act or practice is deceptive under CUTPA: first, there must be a representation, omission, or other practice likely to mislead consumers; second, the consumers must interpret the message reasonably under the circumstances; third, the misleading representation, omission, or practice must be material--that is, likely to affect consumer decisions or conduct. *Caldor, Inc. v. Heslin, supra,* 215 Conn. 597.

*2 In the third count of its revised complaint, the plaintiff alleges that from March 2000 through May 2000 the defendant ordered certain electronic components which were received by the defendant and which the defendant failed to pay for. This claim by itself is simply a breach of contract claim and bears no indicia of an unfair or deceptive act or practice.

In paragraph sixteen of the third count, the plaintiff further asserts that it is an unfair trade practice for a buyer to induce a vendor to make additional deliveries by promising the vendor that the buyer was going to make payments on invoices knowing that it would not or could not make such payments. The allegations of paragraph sixteen are mere legal opinions or legal conclusions and, as such, are not properly considered in determining the legal sufficiency of the allegations of a complaint to state a claim- upon which relief can be granted. "[A motion to strike] admits, all facts well pleaded; it does not admit legal conclusions or the truth or accuracy of opinions stated in the pleadings." *Mingachos v. CBS, Inc.,* 196 Conn. 91, 108 (1985). "In ruling on a motion to strike, the court is limited to the facts alleged in the complaint." *Waters v. Autuori,* 236 Conn. 820, 825 (1996).

The third count of the plaintiffs revised complaint fails to allege any facts that would support a claim that the defendant promised to make payments to the plaintiff knowing that it would not or could not make such payments with the intent of inducing the plaintiff to make additional deliveries. The only promise to make payment by the defendant alleged in the complaint is one dated June 28, 2000 which is after the deliveries at issue in this case.

Even examined in the light most favorable to the plaintiff, its complaint fails to allege facts which constitute unfair or deceptive acts or practices of the defendant within the borders of the Connecticut Unfair Trade Practices Act. Accordingly, the defendant's motion to strike the third count of the plaintiffs revised complaint is hereby granted.

2001 WL 1464730 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

x~,;b:~   D

Not Reported in F. Supp. 2d                                                                    Page 26
(Cite as: 2000 WL 1849865 (D.Conn.))

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

LODA AGENCY, INC. and Frank Loda,
Plaintiffs
v.
NATIONWIDE INSURANCE CO., Defendant

No. 3:001750(EBB).

Oct. 10, 2000.

RULING ON THE MOTION TO DISMISS

BURNS, Senior District J.

INTRODUCTION

*1 Defendant Nationwide Insurance Co., ("NIC" or "Defendant") has moved to dismiss seven counts of the ten-count Complaint filed by Loda Agency, Inc. and Frank Loda (collectively "Loch" or "Plaintiffs"). Specifically, Defendant challenges the First Count, to the extent that it relies on events beyond the applicable statute of limitations; the Second Count, because a principal cannot be liable with tortiously interfering with the business expectancies of its agent; the Third and Ninth Counts because a Connecticut Unfair Practices Act ("CUTPA") claim does not arise from the relationship between a principal and its agent; the Fourth and Eighth Counts because (a) an insurance agent cannot allege a Connecticut Unfair Insurance Practices ("CUIPA") claim against its principal and (b) CUIPA does not provide for a private cause of action; and the Tenth Count because the terms of Plaintiffs' contract, incorporated by reference into the Complaint, permit the very acts complained of by Plaintiffs.

STATEMENT OF FACTS

The Court sets forth only those facts deemed necessary to an understanding of, and decision rendered on, this Motion. The facts are culled from the Complaint, the parties' moving papers and documents incorporated by reference into the Complaint.

Loda was an independent contractor of NIC. He alleges that from 1985 through 1987, he acted as the exclusive NIC agent in order to write NIC's commercial insurance for an account of a certain K. Klarides Supermarkets, Inc. ("KSI"). Frank Loda, as agent for NIC, received commissions on this account.

In 1987, NIC determined not to renew its policy with KSI. However, in 1991, NIC agreed to insure KSI, albeit through a different one of its independent contractor insurance agents. Loda asserts that his Agreement with NIC prohibited this conduct.

NIC settled Loda's original complaint in 1997 by agreeing to assign to him in the future a portion of the insurance policy renewal business from a third NIC insurance agency which was then closing. Loda now contends that the renewal commissions he received from this new business were less than the commissions he would have received from the KSI account.

Loda also asserts that NIC breached oral and written [FN 1] agreements by (a) misrepresenting that its commercial insurance coverage was unavailable for KSI; (b) allowing or facilitating the diversion of the KSI's insurance agreements with NIC during 1991 and subsequent years; (c) not returning the entire KSI accounts and commissions earned thereby to Loda; (d) failing to provide Loda with proper compensation for his lost KSI commissions after the 1993 agreement; and (e) misrepresenting to Loda the value of the renewal commissions generated by the insurance policies for the third, now closed, NIC agency. These facts essentially form the basis for his interference with contractual relations, CUTPA and CUIPA counts.

FN1. He does not distinguish between the two in his Complaint.

Loda next alleges that, in the Spring of 1999, NIC announced that it intended to pay a one-time loyalty bonus to its career agents. Calculation of the bonus was based on insurance premiums generated by each independent contractor during the first six months of 1998 or 1999. Loda contends that, even though he generated the requisite amount of commissions during this time frame, NIC never paid him the bonus.

*2 Loda retired on July 1, 1999. Loda's Complaint alleges that NIC did nothing to advise NIC

Copr. 0 West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp. 2d
(Cite as: 2000 WL 1849865, *2 (D.Conn.))

policyholders for whom Loda had previously provided services of his retirement. NIC continued to provide these same customers with Loda's name, address and telephone number. Resultingly, Loda asserts that he had to expend his own monies on notifying his former clients of his retirement; respond to inquiries regarding coverage before his notice was received by them; and was required to allow NIC to continue to use his office. He claims that NIC was unjustly enriched by this conduct.

### LEGAL ANALYSIS

*I. The Standard of Review*

*Federal Rule of Civil Procedure 12 (b) (6)*

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. Spalding,* 467 U.S. 69, 73, (1984). "The function of a motion to dismiss is merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) *quoting Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980).

Pursuant to a Rule 12(b)(6) analysis, the Court takes all well-pleaded allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). *See also Conley v. Gibson,* 355 U.S. 41, 45-46, (1957)(Federal Rules reject approach that pleading is a game of skill in which one misstep by counsel may be decisive of case): The proper test is whether the complaint, viewed in this manner, states *any* valid ground for relief. *Conley,* 355 U.S. at 45-46.

Although Loda does not attach his Agent's Agreement to the Complaint, the Court may consider this document in Ruling on the Motion to Dismiss, without converting it into a summary judgment motion. *See* F.R.Civ.P. 10(c). When a plaintiff fails to introduce a pertinent document to his Complaint, the defendant may introduce the exhibit as part of his motion attacking the pleading. Wright & Miller, 5 *Federal Practice & Procedure:* Civil at § 1327. *Accord, Bryan v. Acorn Hotel, Inc.,* 931 F.Supp. 394, 395,(E.D.Pa.), aff d. 162 F.3d

1150 (1996). Here, the Agent's Agreement, attached to Defendant's moving papers and incorporated by reference in Plaintiffs' Complaint, will be considered in the Ruling on this Motion.

*II The Standard* As Applied [FN2]

> FN2. The parties have not dealt with the Counts of the Complaint seriatim. Accordingly, the Court will also address each argument as it is presented and responded to.

The CUIPA Counts: Four and Eight

In the Fourth and Eighth Counts, Plaintiffs assert that NIC violated CUIPA by its conduct in the relationship with Frank Loda as its independent contractor insurance agent.

Section 38a-815 of CUIPA prohibits any person engaging in a trade practice that is an "unfair method of competition or an unfair or deceptive act or practice in the business of insurance." Unfair practices in the business of insurance are defined at Section 38a-816. A careful reading of this lengthy statute reveals no unfair practice in the business of insurance among Loda and NIC. The allegations of the Complaint simply do not meet the standards of this statute.

*3 Further, Plaintiffs' claims do not meet the three-prong test of the seminal case defining "business of insurance", Group *Health & Life Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211-230 (1979). The three criteria to be employed in determining whether a particular practice involves the relationship between the insurer and its policyholders are:

1. Whether the practice has the effect of transferring or spreading a policyholders' risk;
2. Whether the practice is an integral part of the policy relationship between the insurer and the insured; and
3. Whether the practice is limited to entities within the insurance industry.

Each inquiry must be answered in favor of NIC. First, none of Plaintiffs' allegations concern the spreading, or have the effect of spreading, policyholders' risks. In the end, it is NIC which determines for whom it will write policies. There are no allegations of this behavior by NIC in the Complaint.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Secondly, the practice must be between the insured and the insurer. Again, the claimed misconduct found in the Complaint has nothing to do with the policyholder-insurance company relationship but concerns NIC's relationship with one of its insurance sales agents.

Third, the practice at issue is not limited to entities within the insurance industry. Issues of failure to pay commissions, bonuses or other compensation exist in a multitude of industries.

What truly is an issue under the CUIPA counts are garden-variety breach of contract allegations. Counts Four and Eight are, accordingly, hereby DISMISSED. [FN3]

> FN3. The disposition on the Fourth and Eight Counts means that no determination of whether a private cause of action lies under CUIPA is required.

The CUTPA Counts: Three and Nine

The central prohibition of CUTPA is contained in Section 42-110b(a), which provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in any trade or commerce." In determining whether a given action is "unfair", the Connecticut Supreme Court has adopted the so-called "cigarette rule" developed by the Federal Trade Commission Act. According to the cigarette rule, this Court must consider:

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other business].

*Boulevard Associates v. Sovereign Hotel, Inc.,* 72 F.3d 1029, 1038 (2d Cir.1995), *quoting Atlantic Richfield v. Canaan Oil Co.,* 202 Conn. 234, 239 (1987)(alterations in original). Although Plaintiffs -assert that NIC's actions violate this statute, what has been incorporated in these counts is the alleged breaches of contract only. The Court agrees with Defendant and the vast majority of courts in Connecticut that a simple breach of contract is not

sufficient

*4 to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth in what respect the defendant's activities are either immoral, unethical, unscrupulous, or offensive to public policy.

*Chaspek Mfg. Corp. v. Tandet,* 1995 WL 447948 at *12 (Conn.Super Ct. June 16, 1995). *See also Lester v. Resorts Camplands International, Inc.,* 27 Conn.App., 59, 62 (1992)(more than contract violation necessary to claim for punitive damages; requires calculated, deceitful, and unfair conduct associated with a breach of contract to sustain CUTPA damages); *Emless Equipment Leasing Corp. v. Waterbury Transmissions, Inc.,* 41 Conn.Supp. **575, 580** (1991)(" 'simple breach of contract, even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act' ")(alteration in original); *A. Secondino & Son, Inc. v. L.D. Land Co.,* 1994 WL 728775 at *2-3 ( Conn.Super. Ct., December 29,1994) (recognizing that this rule is the majority rule in Connecticut).

Inasmuch as Loda has simply incorporated by reference the alleged breaches of contract found in Counts One and Five and fails to set forth exactly [FN4] how such conduct violates the cigarette rule, the Third and Ninth Counts are hereby DISMISSED.

> FN4. The CUTPA counts merely call the alleged breaches of contract "immoral, oppressive and unscrupulous" without ever explaining how they can be so characterized.

The Second Count: Tortious Interference with a Contract.

In the Second Count, Loda asserts that NIC interfered with the contractual relationship between Loda and KSI. However, the direct parties to the insurance contract at issue are KSI and NIC and not Loda and KSI.

Connecticut courts have long recognized a cause of action for Trttous interference with contract rights or other business relations. *See, e.g., Blake v. Levy,* 191 Conn. 257, (1983). "However, it is well-settled

Not Reported in F.Supp.2d
(Cite as: 2000 WL 1849865, *4 (D.Conn.))

that the tort of interference with contractual relation only lies when a third party adversely affects the contractual relationship between the two parties." *Paint Products Co. v. Minwax Co.,* 448 F.Supp. 656, 658 (D.Conn. 1998, *citing Rand W Hat Shop v.* Scully, 98 1, 14 (1992). Hence, "[i]n Connecticut, a party to a contract cannot be held liable for tortious interference with that·contract." *Urashka v. Griffin Hospital,* 841 -F.Supp. 468, 475 (D.Comi.1994). *Accord, Powell v.. Feroleto Steel Co.,* 659 F.Supp. 303, 307 (D.Comi.1996)(Cabranes, J.)(as a matter of law, party to a contract cannot interfere with that contract).

The parties to the contract of insurance in the present case are NIC and KSI. Loda was the independent contractor who brought the parties together but it still remains clear exactly .who the contract of insurance was between. Loda was merely a third-party beneficiary of the contract between NIC and KSI, in that he received commissions for his work. At no time, did a contract directly exist between Loda and KSI. Accordingly, NIC cannot be held liable for tortiously interfering with its own contract.

*5 The Plaintiffs have not brought to this Court's attention any authority that states otherwise nor has the Court in its own research found any. Accordingly, the Second Count is hereby DISMISSED.

Count One: The Statutes of Limitation

In Count One, two separate agreements are at issue. The first is "contractual agreements and policies" between NIC and its agents which "protected a broker such _as Plaintiff LODA from attempts by other Nationwide brokers or representatives to interfere with the underwriting, writing, or renewal of policyholders ...". Plaintiffs assert that these agreements are written agreements and policies. [FN5] The second alleged agreement at issue is one in which NIC, in 1997, :agreed that, in order to compensate the Plaintiffs for lost annual commissions from the KSI commercial account, NIC would assign to the Plaintiffs a portion of the ~~ renewal business of an NIC insurance agency which was closing. This is claimed to be a misrepresentation by NIC.

> FN5. The Court has carefully reviewed the

Corporate Agency Agreement between Loda and NIC and finds no such language therein. If there was a second policy which supports this contention, it was Plaintiff' urden to produce such a document.

In their moving papers, Plaintiffs concede that the actions complained of in large part in Count One occurred outside the limitations period, from 1987 to 1991. Thus, all of these allegations are barred by the six-year statute of limitations. *See* Conn.Gen.Stat. § 52-581 (three year limitations for oral contract; § 52-576 (six year limitations for written contract).

This Complaint was filed in April, 2000. Thus, any actions alleged to have been done by NIC prior to April, 1994, are barred by the statute of limitations. Those include the refusal of NIC to renew KSI's commercial insurance from 1987 through 1991; allowing and/or facilitating the diversion of KSI's's commercial insurance accounts during 1991 and subsequent years [FN6]; and doing nothing to return the KSI commercial insurance accounts between 1991 and 1997. [FN7]

> FN6. Any actions taken between 1991 and March, 1994 are barred by the six-year statute of limitations, in that this Agreement would have had to be in writing. *See,* Corporate Agency Agreement. Thus, the only viable claim, if it exists, is from March, 1994 to the present.

> FN7. Again, under the Corporate Agency Agreement, NIC had no obligations to return the KSI accounts to Loda.

The second claim is that NIC misrepresented the value of the renewal commissions from the insurance policies of a third, closing insurance agency. Further, it is contended that NIC failed to provide Loda with the compensation for the lost KSI commercial insurance commissions after 1997, as allegedly required by a settlement agreement of July, 1997.

Hence, any written agreements or contract drafted and executed before April, 1994 are barred by the statute of limitations. Any oral representations prior to April, 1997 are also barred by the statute of limitations for oral contracts.

Count One is hereby DISMISSED WITHOUT PREJUDICE. On or before October 31, 2000,

Copr. 0 West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                    Page 30
(Cite as: 2000 WL 1849865, *5 (D.Conn.))

Plaintiffs shall amend their Count One, asserting exactly  when these circumstances occurred and attaching thereto any documents in support thereof. Any written agreements will not be considered unless they are dated after 1994.

 Count Ten: Unjust Enrichment.

 Plaintiff  Frank-Loda  alleges that NIC was unjustly enriched after his retirement from NIC, in that NIC continued to use his office, send out bills with his name, address and telephone number on it, and send him mail for-processing.  He further claims that he gave ample notice of his retirement, yet NIC did nothing to advise NIC customers of this fact. As a result of the NIC's alleged inaction, Plaintiff Frank Loda asserts that he was forced to expend his own time and funds to prepare NIC notices to be sent out to  customers and respond to many customer inquiries  regarding  NIC insurance quotations, renewals or policy issues, some of which he needed to respond to from his home.

 *6 In the Corporate Agency Agreement, Loda agreed:
  1) ... If this agreement is canceled, your name will be removed as soon as possible, but you acknowledge that occasional error may cause it to continue  to  be  printed.  (Corporate  Agency

Agreement at 114.)
 2) ... The agent hereby gives the Companies permission to use his name on those billings and for use of his name for a reasonable period of time following the cancellation. (Corporate Agreement at x(16).

 Plaintiff Frank Loda unfortunately has not specified when he was incurring these expenses, which would be critical to a decision as to the reasonableness of Defendant's action or inaction. The   Motion is Denied as to the Tenth Count.

CONCLUSION

 For each of the foregoing reasons the Motion to Dismiss [Doc. No. 15] is hereby GRANTED IN PART AND DENIED IN PART. Counts Four, Eight, Three, Nine, and Two are hereby dismissed. The First Count and Tenth Counts shall be amended, if  legally possible,   within the dictates of this opinion, on or before October 31, 2000.

 SO ORDERED

 2000 WL 1849865 (D.Conn.)

 END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works