UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE TRAVEL COMPANION, LLC, | CASE NO. 3:03 cv 0289 (DJS) |
| Plaintiff, | |
| v. | **LOCAL RULE 56(a)(1) STATEMENT** |
| FIRST NATIONAL BANK OF OMAHA, | |
| Defendant. | |

**A.     The Travel Companion's Initial Unsolicited Contact**

1.     In late January or early February 2002, Douglas Payette ("Payette"), managing member of The Travel Companion ("TTC"), sent First National Bank of Omaha ("First National") an unsolicited offer to market travel packages offered by TTC, to First National's credit card customers (Declaration of Susan Tieger ¶ 3). (Exhibit "A")[1].

2.     In or about February, 2002, an initial conference call between representatives of First National and TTC (the "Parties") was held to discuss the purpose of and the desired outcome of a possible partnership between the Parties (Complaint).  (Exhibit "B").

**B.     Transmittal of Draft Agreement.**

3.     On and before July 17, 2002, Payette acknowledges he had no agreement with First National Bank of Omaha.  Payette Depo. 51:20-24. (Exhibit "C").

---

[1] The original Declaration of Susan Tieger was previously filed with the Defendant's Motion to Dismiss dated May 5, 2003.  A copy of the Declaration is attached hereto as Exhibit A.

01-568812.1

4.    Payette contacted First National and requested a copy of a draft Marketing Agreement (the "draft Agreement") (Declaration of Susan Tieger ¶ 4).  On or about July 18, 2002, First National sent Payette the unsigned draft Agreement via electronic mail.  *Id; see also* Payette Depo. 51-14-19.

5.    Payette acknowledges receiving the draft Agreement.  Payette Depo. 51:7-10, Ex. 23.

6.    The draft Agreement states:

> 1.    (a)    *Services.*    FNB desires to make certain travel and travel related services and benefits available to its cardholders and has selected Service Provider to provide such travel and travel-related services pursuant to **executed schedules between the parties ("Services")**.  Service Provider shall provide Services set forth on such schedules, which may include providing Services directly to lists of recipients ("Recipients") that FNB provides to Service Provider in an otherwise agreed upon format.  Service Provider shall return lists of Recipients to FNB.

> * * *

> 7.    **Term.** This Agreement shall be effective upon execution of this Agreement and shall remain **effective as long as any schedule is in effect**.

(Declaration of Susan Tieger ¶ 4 Ex. A).

7.    No schedule to the draft Agreement was ever drafted, negotiated or delivered to Payette (Declaration of Susan Tieger ¶ 5).

8.    Payette claims that a Power Point presentation passed back and forth between TTC and FIRST NATIONAL "give[s] schedules for the activities that were contemplated by the marketing agreement." Payette Depo. 77-12:17.

01-568812.1

2

9.    The Power Point presentation was merely a vehicle in which the "negotiations" and "discussions" between TTC and FIRST NATIONAL were customarily "embodied." Payette Depo. 77:18-25.

10.    The Power Point presentation document is not executed by either party. (Power Point presentation document) (Exhibit "D"). *See* Payette Depo. 77:3-6, authenticating Power Point presentation document.

11.    On or about July 24, 2002, First National contacted Payette via telephone and indicated it was no longer interested in a contractual relationship with TTC (Declaration of Susan Tieger ¶ 5).

Dated this 27 day of February, 2004.

FIRST NATIONAL BANK OF OMAHA
Defendant

By _____
Calum B. Anderson, #ct07611
DANAHER, LAGNESE & NEAL, P.C.
21 Oak Street
Hartford, CT 06106
(860) 247-3666
canderson@dtln.com

and

Richard P. Jeffries, #ct24725
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
(402) 346-6000

01-568812.1

3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing

**LOCAL RULE 56(a) (1)** was sent via United States first-class mail, postage prepaid, this

2 7 day of February, 2004 to the following:

Gerald P. Sack, Esq.
Sack, Spector & Karsten
836 Farmington Avenue
West Hartford, CT 06119

Richard P. Jeffries, Esq.
Kutak Rock, LLP
1650 Farnam Street
Omaha, NE 68102

_____
Calum B. Anderson

01-568812.1

4

Exhibit A

UNITED STATES DISTRICT CO~~~~
FOR THE DISTRICT OF CONNEC~

*A*

THE TRAVEL COMPANION, LLC,

Plaintiff,

v.

FIRST NATIONAL BANK OF OMAHA,

Defendant.

CAS

**DECLARATION OF SUSAN TIEGER**

I, Susan Tieger, of lawful age and under penalty of perjury, declare and state:

1.      I am a resident and citizen of Nebraska.  I am employed by First National Bank of Omaha ("First National"), One First National Center, Post Office Box 2196, Omaha, Nebraska 68103-2196, as a Vice President in Marketing.

2.      As a Vice President in Marketing, I am responsible for marketing promotions associated with First National's Visa product line.

3.      In late January or early February 2002, Douglas Payette ("Payette"), managing member of The Travel Companion ("TTC"), sent First National Bank of Omaha ("First National") an unsolicited offer to market travel packages offered by TTC, to First National's credit card customers.  After receiving Payette's letter of solicitation, an initial conference call between representatives of First National and TTC was held to discuss the purpose and the desired outcome of a possible partnership between First National and TTC.

4.      Payette contacted First National and requested a copy of a draft Marketing Agreement (the "draft Agreement") First National subsequently sent Payette the draft Agreement via electronic mail.  A copy of the draft Agreement, signed by Payette but not First National, is attached hereto as Exhibit A.

01-482624.1

5.      No schedule to the draft Agreement was ever drafted, negotiated or delivered to Payette.

6.      On or about  July 24, 2002, First National indicated it was no longer interested in a contractual relationship with TTC.

I hereby declare under penalty of perjury the foregoing is true and correct.


Dated this 2 day of May, 2003.

_Susan Tieger_
Susan Tieger

EXHIBIT A

## MARKETING AGREEMENT

THIS MARKETING AGREEMENT (this "Agreement") is made between First National Bank of Omaha ("FNB") and the undersigned service provider ("Service Provider"). In consideration of the premises and the mutual covenants and agreements set forth herein and other good and valuable consideration, the parties agree as follows:

1.        *Services.*

(a)        *Services.*  FNB desires to make certain travel and travel related services and benefits available to its cardholders and has selected Service Provider to provide such travel and travel-related services pursuant to executed schedules between the parties ("Services"). (Service Provider shall provide Services set forth on such schedules, which may include providing Services directly to lists of recipients ("Recipients") that FNB provides to Service Provider in a otherwise agreed upon format. Service Provider shall return lists of Recipients to FNB.

(b)        *Quality and Compliance.* Service Provider shall provide the Services in a professional, courteous manner, consistent with industry standards.  Service Provider shall comply with all applicable association, local, state, and federal laws, ordinances, rules, regulations and codes ("Requirements of Law") and obtain any applicable federal, state, local or association licenses required to provide Services.

(c)        *On-Site Reviews.*  Upon reasonable advance notice to Service Provider, FNB shall have the right to visit Service Provider's facilities to verify that Service Provider complies with this Agreement and provides Services in accordance with the standards set forth in this Agreement and applicable schedules.

(d)        *Reports.*  During the term of any schedule, Service Provider agrees to provide FNB with any available reports which FNB requests.

(e)        *Service Provider Responsibilities.*  Service Provider agrees that: (i) Service Provider will not misrepresent its relationship with FNB; (ii) FNB shall have the right to approve the form and content of any materials that Service Provider will provide to Recipients in providing Services; (iii) Service Provider is solely responsible for its own costs and expenses of performance hereunder except as otherwise set forth; (iv) Service Provider shall be solely responsible for the acts and omissions of its employees and shall have sole responsibility for their supervision, direction and control; and (v) Service Provider shall conduct business in a manner that reflects favorably at all times on the reputation of FNB, including, but not limited to, making no false, deceptive or misleading representations with regard to FNB or its products.

(f)        *Indemnity.*  Notwithstanding anything to the contrary in this Agreement, Service Provider shall defend, indemnify, and hold FNB, its shareholders, officers and directors, harmless from and against any and all losses, damages, claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or resulting from the breach of Service Provider's obligations under this Agreement, and any allegation that Services provided by Service Provider infringe or misappropriate the patent, copyright, trademark, service mark, trade secret or other intellectual or proprietary rights of any third party (excluding infringement claims pertaining to authorized usage of FNB's trademarks or service marks).

2.        *FNB Responsibilities.*  FNB retains sole responsibility for customer satisfaction and compliance with all applicable federal, state and local laws and regulations regarding all products or services provided to Recipients by FNB.  FNB shall defend, indemnify, and hold Service Provider, its shareholders, officers and directors, harmless from and against any and all losses, damages, claims, liabilities, costs and

expenses (including reasonable attorneys' fees) arising out of or relating to the products or services that FNB provides to Recipients.

**3.    Compensation.** Service Provider agrees to pay all marketing expenses incurred in providing the Services, including, but not limited to, creative development, printing costs, shipment costs of final marketing piece to FNB for insertion or direct mail, and trip expenses for any sweepstakes campaign. FNB agrees to pay postage costs.

**4.    Trademarks/Copyright.** FNB and Service Provider recognize and acknowledge the existence and validity of the other party's intellectual property rights in its own names, trademarks, and copyrights. FNB and Service Provider each acknowledge and agree that they shall acquire no interest in any trademark, service mark, copyright and/or other intellectual property of the other party. FNB hereby grants to Service Provider, the non-exclusive, royalty-free right and license to use FNB's trademarks and/or service marks in connection with the program described herein as agreed upon in writing by FNB. Service Provider hereby grants to FNB, the non-exclusive, royalty-free right and license to use Service Provider's trademarks and/or service marks in connection with the program described herein as agreed upon in writing by Service Provider. Service Provider agrees not to use or reproduce any names or trademarks owned or licensed by FNB in any marketing materials without the express written authorization of FNB, which authorization shall not be unreasonably withheld. FNB does not need to obtain authorization if FNB uses or reproduces any names or trademarks owned or licensed by Service Provider in any printed materials in accordance with specifications provided by Service Provider.

**5.    Marketing.** Marketing shall be conducted as mutually agreed by the parties. Statement messages regarding the services will be included on cardholder statements as deemed necessary by FNB. In addition, the parties agree to conduct (i) one (1) statement insert; (ii) one (1) direct mail solicitation; and (iii) one (1) sweepstakes campaign. The sweepstakes campaign shall be conducted in 2002 with completion of the campaign in the first quarter of 2003. Service Provider shall code the statement insert, direct mail piece and any other applicable marketing material for tracking of cardholder response and sales. Tracking results for each marketing program will be reviewed by FNB for a determination regarding continuation of the program and the necessity of any follow-up direct mail and statement programs.

**6.    Confidentiality.**

**(a)    Confidential Information and Obligation to Protect.** Each party (i) agrees to maintain in confidence any information that it may obtain from the other in the course of this Agreement; (ii) shall use such information solely for the purposes contemplated by this Agreement, and shall not disclose such information to any third party except as required by applicable law or regulation; (iii) shall take all reasonable steps to protect the confidentiality of such information, in no event using a standard of care less than the same standard used to protect its own confidential information; and (iv) shall give access to such information only to those individuals who have a need to know in connection with the performing of that party's obligations under this Agreement. Upon request by the disclosing party, the receiving party shall promptly destroy such information or return such information to the disclosing party in the same format as the disclosing party provided such information to the receiving party. To the extent that the receiving party is permitted to retransmit any information it receives from the disclosing party, the mode of retransmission must be at least as secure as the mode by which the disclosing party transmitted the information to the receiving party. The confidentiality obligations in this Agreement do not apply to information that (A) is, at

the time of disclosure to the recipient, or thereafter becomes, through no act or omission of the recipient, a part of the public domain; (B) was in the recipient's lawful possession without an accompanying secrecy obligation prior to the disclosure; (C) is hereafter lawfully disclosed to the recipient by a third party without an accompanying secrecy obligation or breach of any duty or agreement by which such third party is bound; or (D) is independently developed by the recipient. Notwithstanding if such information is or becomes lawfully in the public domain, the receiving party shall maintain according to this section the confidentiality of any information which includes the identities of the disclosing party's consumers. This section shall not be deemed to prohibit disclosures: (1) required by applicable law, regulation, court order or subpoena; (2) to auditors or regulators; (3) to service providers of either party as necessary for the performance of such party's duties under this Agreement, provided such service providers are subject to binding confidentiality obligations; (4) to the professional advisors of either party, provided that such advisors are obligated to maintain the confidentiality of the information they receive; or (5) is provided to a consumer reporting agency in accordance with the Fair Credit Reporting Act. The parties agree to comply with applicable privacy laws (including implementation of appropriate measures designed to safeguard consumer information). Breach of this section shall give rise to irreparable injury, inadequately compensable in damages. Accordingly, either party may seek injunctive relief against the breach or threatened breach by the other of either such section, in addition to such legal remedies as may be available, including the recovery of damages.

(b)     To the extent that Service Provider receives nonpublic personal information concerning consumers, Service Provider agrees: (i) to maintain the confidentiality of such information to at least the same extent that FNB must maintain such confidentiality under applicable privacy regulations; (ii) not to, in any event, sell, rent or lease such information to any third party; (iii) not to use or reproduce such information for any purpose other than as contemplated by this Agreement or as otherwise permitted by applicable regulation; and (iv) to return any such information to FNB on demand. Nonpublic personal information includes, without limitation, all information consumers provide in an application for FNB's products or services.

(c)     Section 4 shall survive termination of this Agreement.

**7.**     *Term.*   This Agreement shall be effective upon execution of this Agreement and shall remain effective as long as any schedule is in effect. In the event that either party materially breaches this Agreement, the non-breaching party may terminate this Agreement and any outstanding schedule effective upon 30 days written notice, unless such breach is cured (or stayed in the case of an involuntary legal proceeding) within said 30-day period. Either party shall be considered to be in material breach of this Agreement if it is in default of any obligation hereunder, if a substantial part of its property is or becomes subject to a levy, seizure, assignment or sale for or by any creditor or governmental agency, or such party becomes insolvent, ceases doing business, or files or has filed against it any voluntary or involuntary bankruptcy, receivership or reorganization proceeding.

**8.**     *Liability.*   Service Provider shall not be liable for failure to perform if the failure results from a cause beyond its control, including, without limitation, fire, electrical, mechanical, or equipment breakdowns, delays by third party vendors and/or communications carriers, civil disturbances or disorders, strikes, or Acts of God. Except for the parties' obligations pursuant to Section 4, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL OR EXEMPLARY DAMAGES OR LOST PROFITS, WHETHER OR NOT SUCH DAMAGES WERE FORESEEABLE OR WAS ADVISED OF THE POSSIBILITY THEREOF.

**9.**     *Relationship of Parties.*   The relationship of the parties hereunder shall be that of independent contractors. Neither party shall be deemed an employee, agent, joint venturer, or partner of the other and neither party shall have the power or authority to bind or obligate the other.

10.        *Miscellaneous.*  This Agreement: (a) may be amended only in writing signed by both parties; (b) except as provided below, shall not be assignable by either party without the other's written consent (which consent shall not be unreasonably withheld); (c) shall be binding upon and inure to the benefit of the parties' successors and permitted assigns; (d) shall be governed in all respects by the laws of the State of Nebraska: and (e) is the complete and exclusive statement of the agreement between the parties relating to the subject matter hereof, which supersedes and merges all prior proposals, understandings, and agreements, oral or written, between the parties relating to the subject matter hereof.  FNB may assign to any of its affiliates all or any portion of FNB's rights or duties under this Agreement.  No waiver or modification of the terms hereof shall be binding unless in writing signed by the disclosing party.  No waiver of any provision hereof at any time shall operate as a waiver of any other provision or as a waiver of any subsequent breach of the same provision.  The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of the remaining provisions, all of which shall continue in full force and effect.  Notices hereunder shall be given in writing by United States registered or certified mail, facsimile, or overnight courier, addressed to the parties at the addresses or facsimile telephone numbers set forth below, or such other address or facsimile telephone number as the parties may designate in writing from time to time.

FNB:

First National Bank of Omaha
1620 Dodge Street Stop 3192
Omaha, Nebraska  68197-3192
Attn: Robert Kelly, Esq.
Fax: (402) 636-6019

Service Provider:

The Travel Companion, LLC
120 Saybrook Road
Middletown, Connecticut 06457
Attn: Doug Payette
Fax: (860) 346-1118

IN WITNESS WHEREOF, the parties have executed this Fulfillment Services Agreement as of _____.

FIRST NATIONAL BANK OF OMAHA

By_____
Title_____

SERVICE PROVIDER:
THE TRAVEL COMPANION, LLC

By _____
Title _____

Exhibit B

FILED

⌐ 2: 59

𝒷

CURT
OT

UNITED STATES DISTRICT C
DISTRICT OF CONNECTI

THE TRAVEL COMPANION, LLC   :   CIVIL ACTION

    VS.                      :   NO.    3 0 3 C V 0 2 o J ⅋ DJS

FIRST NATIONAL BANK OF OMAHA   :   FEBRUARY 10, 2003

## COMPLAINT

### Jurisdiction

1.     Plaintiff, The Travel Companion, LLC ("TTC"), is a Connecticut limited liability company engaged in the business of marketing and selling travel services and travel-related products with a principal place of business in Middletown, Connecticut.

2.     Defendant, First National Bank of Omaha ("FNB"), is a financial institution engaged in the business of banking with a principal place of business located in Omaha, Nebraska.

3.     The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.     Venue in this District is based on 28 U.S.C. § 1391.

<u>FIRST COUNT</u> **(Breach of Contract)**

5.    Beginning on or about February, 2002, plaintiff, through its principal member, Doug Payette, and defendant, through its authorized employees and/or agents, engaged in negotiations relating to partnership opportunities whereby FNB would make available to its credit card holders various travel and travel–related services that would be provided through TTC.

6.    The marketing plan negotiated by and agreed upon by FNB and TTC provided that TTC would prepare and publish flyers offering discounts on travel services and travel-related products that would be mailed by FNB to its qualified credit card holders.

7.    The marketing plan further provided that when FNB credit card holders purchased the advertised travel services and/or travel-related products, TTC would be paid a commission and/or fee.

8.    In the course of their negotiations, plaintiff and defendant entered into a confidentiality agreement whereby each agreed not to disclose or divulge confidential marketing and business information of the other.

9.    Acting in reliance on their agreed upon marketing plan, as well as the representations of FNB as to its active credit card holders, transactions and sales history, TTC invested significant resources in order to implement the agreed upon partnership.

10.    On or about July, 2002, plaintiff and defendant reached an agreement on the terms and conditions of their partnership and defendant forwarded to plaintiff a contract entitled "Marketing Agreement", which memorialized such terms and conditions.

11.    Plaintiff accepted the offer by defendant as set forth in the "Marketing Agreement" and was ready and willing to substantially perform its obligations pursuant to the agreed upon partnership.

12.    Despite its prior representations and its offer as set forth in the "Marketing Agreement" it prepared, defendant failed and refused to perform in accordance with this agreement.

13.    As a proximate result of defendant's breach of its contractual obligations, plaintiff has sustained damages including but not limited to: expenses associated with development of the products and services to be provided by TTC in the course of the agreed-upon partnership; disruption of its business activities; and lost revenues and profits.

**SECOND COUNT**

1-12.    Paragraphs 1–12 of the First Count are hereby incorporated and made Paragraphs 1 - 12 of the Second Count as if fully set forth herein.

13.    Defendant knew or should have known that its representations as to the partnership negotiated and agreed upon with plaintiff would induce reliance and such representations did in fact induce reliance by plaintiff.

14.   Defendant's breach of its representations as to the partnership which were relied upon by plaintiff constitutes a breach of the doctrine of promissory estoppel.

15.   As a proximate result of such breach, plaintiff has sustained damages, including but not limited to:  expenses associated with the development of the products and services to be provided by TTC in the course of the agreed-upon partnership; disruption of its business activities; and lost revenues and profits.

**THIRD COUNT**

1-12.   Paragraphs 1–12 of the Second Count are hereby incorporated and made Paragraphs 1 - 12 of the Third Count as if fully set forth herein.

13.   In failing to adhere to its representations as to the partnership negotiated and agreed upon, defendant violated the duty of good faith and fair dealing that is implied in every contract.

14.   As a proximate result of defendant's actions or omissions plaintiff has sustained damages, including but not limited to:  expenses associated with development of the products and services to be provided by TTC in the course of the agreed-upon partnership; disruption of its business activities; and lost revenues and profits.

**FOURTH COUNT**

1-12.   Paragraphs 1–12 of the Third Count are hereby incorporated and made Paragraphs 1 - 12 of the Fourth Count as if fully set forth herein.

13.    The foregoing constitutes a violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §42-110a, et seq, in that the conduct of the defendant as alleged was immoral, oppressive and unscrupulous causing substantial injury to the plaintiff.

14.    As a proximate result of defendant's conduct, plaintiff has sustained damages, including but not limited to:  expenses associated with development of the products and services to be provided by TTC in the course of the agreed-upon partnership; disruption of its business activities; and lost revenues and profits.

WHEREFORE, plaintiff claims judgment against defendant as follows.

1.    Compensatory damages in the amount of $1,500,000.00;

2.    Punitive damages pursuant to Connecticut General Statutes §42-110g(a) as to the Fourth Count;

3.    A reasonable attorney's fee as to the Fourth Count; and

4.    Such other relief as the Court may deem just.

Plaintiff demands a trial by jury.

PLAINTIFF
THE TRAVEL COMPANION, LLC.

By_____

Gerald S. Sack
Sack, Spector & Karsten
836 Farmington Avenue
West Hartford, CT  06119
(860) 233-8251
Federal Bar #ct05279

Exhibit C

IN THE UNITED STATES DISTRICT

FOR THE DISTRICT OF CONNECTICU

- - - - - - - - - - - - - - - -
                               :

THE TRAVEL COMPANION, LLC,      :
                               :
           Plaintiff,    :
                               :
      vs.               : Case Number
                               : 3:03CV0289 (DJS)
FIRST NATIONAL BANK OF OMAHA,  :
                               :
           Defendant.    :
                               :
- - - - - - - - - - - - - - - - - - x

        Deposition of DOUG PAYETTE, taken

pursuant to the Federal Rules of Civil

Procedure, at the law offices of Sack,

Spector & Karsten, LLP, 836 Farmington

Avenue, West Hartford, Connecticut, before

Jenny L. Albert, License #00207, a Registered

Professional Reporter and Notary Public in

and for the State of Connecticut, on Tuesday,

October 28, 2003, at 9:16 a.m.

1    indicated that Exhibit 23 accompanied Exhibit 21; is

2    that correct?

3        A.    Can I see them again, please?  Yes.  That's

4    correct.

5        Q.    And it came as an e-mail attachment?

6        A.    That's correct.

7        Q.    Okay.  And would you agree with me Exhibit 23

8    was e-mailed to you without a signature of a First

9    National Bank representative?

10        A.    That's correct.

11        Q.    Okay.  And I'm going to show you what is the

12    last page of Exhibit 23.  Is that your signature --

13        A.    That's correct.

14        Q.    -- under The Travel Companion signature

15    block?

16            I notice that there's no date indicated

17    there.  When did you sign or execute -- strike that.

18    When did you affix your signature to that document?

19        A.    The same date that I received it, July 18th.

20        Q.    Okay.  So on July 17th, you had not entered

21    into an agreement with First National Bank; am I

22    correct?

23        A.    I did not have a contract at that point,

24    correct.

25        Q.    Okay.  And on July 17th, from February of

```
 1    CROSS-EXAMINATION

 2    BY MR. SACK:

 3         Q.   Mr. Payette, showing you Plaintiff's Exhibit

 4    1, is this the final version of the so-called power

 5    point presentation, the best of your recollection?

 6         A.   Yes.

 7         Q.   And this is the one closest in time to the

 8    time you entered into the agreement with the First

 9    National Bank of Omaha?

10              MR. GARLAND:  I'm going to object.

11         A.   Yes.

12         Q.   All right.  And in fact, in here, does this

13    give schedules for the activities that were

14    contemplated by the marketing agreement?

15              MR. GARLAND:  I'm going to again object

16              as to form.

17         A.   Yes.

18         Q.   Okay.  And was it the custom of your

19    negotiations, the discussions with first Amy Blubaugh

20    and then Allison Steen that the discussions would be

21    embodied in a power point presentation which was

22    e-mailed to you?

23              MR. GARLAND:  I'm going to object to

24              form.

25         A.   Yes.
```

SCRIBES, INC.

Exhibit D

# THE TRAVEL COMPANION
## AND

**①** # First National B₍
## Omaha

# TARGETED PARTNERSHIP
# OPPORTUNITIES

PLAINTIFF'S
EXHIBIT
1
10/28/03







# THE TRAVEL COMPANION
## AND
# FIRST NATIONAL BANK OMAHA
# PARTNERSHIP OPPORTUNITIES



Objectives
- To drive customers to purchase travel products and vacation packages through The Travel Companion with their FNBO Credit Card

- To add value to FNBO's Credit Cards by providing our customers with discounts on travel purchases made through The Travel Companion

- To acquire and retain new accounts by adding an appealing value to FNBO's Credit Card products







# THE TRAVEL COMPANION
## AND
# FIRST NATIONAL BANK OMAHA
## PARTNERSHIP OPPORTUNITIES

↝ **October 2002 Statement Insert Test** - promote targeted vacation specials to all FNBO Credit Card customers who are noted to be travelers and fall under "GOOD GUY" criteria.
- ↝ 1x insert - scheduled for the month of October, 2002.
- ↝ Specials valid on purchases made with their FNBO Credit Card.
- ↝ Inserts will be designed within the FNBO branding guidelines.
- ↝ TTC will create and print the insert.
- ↝ FNBO will provide approval of copy and artwork.
- ↝ TTC will ship the printed inserts to FNBO for insertion into billing statements.
- ↝ Inserts coded by TTC for tracking of response and sales - NO TEST and Control needed.
- ↝ Program will be reviewed 3 months after mailing.

↝ **Coupon Direct Mail Test Promotion** - a mailer and letter sent to **FNBO College Credit Card customers** with discounted Spring Break travel program coupons.
- ↝ 1x mailing - scheduled for **October 24, 2002**.
- ↝ Mailer designed within the FNBO branding guidelines.
- ↝ Specials valid on purchases made with their FNBO Credit Card.
- ↝ Mailer created and printed by The Travel Companion.
- ↝ Letter written by FNBO (if not included with mailer design).
- ↝ FNBO will provide approval of copy and artwork.
- ↝ TTC will ship the printed mailers to FNBO for mailing.
- ↝ FNBO will cover all postage costs.
- ↝ FNBO will mail to all College Credit Card customers that fall under "GOOD GUY" criteria (NO Inactive Event Marketing accounts and Never Active accounts).
- ↝ Coupons coded by TTC for tracking of response and sales - NO TEST and Control needed.
- ↝ Program will be reviewed 3 months after mailing.

↝ The Travel Companion will manage an online store selling travel-related merchandise and allowing customers to purchase vacation packages. (See attached - e-bags template.) 10% discount on "e-bags" items to all TTC customers. Various pop up windows with promote an additional 20% discount to FNBO Credit Credit customers on special programs/items throughout the year - TBD. FNBO customers also will receive a 5% discount on Vacation Packages booked through TTC. All discounts funded by TTC. No link to FNBO site at this time. Site will be promoted on marketing materials.

# THE TRAVEL COMPANION
## AND
## FIRST NATIONAL BANK OMAHA
## PARTNERSHIP OPPORTUNITIES

➜ Toll-free Customer Service access, 877-44PRIDE (877-447-7433) - 24/7, worldwide - for customer service issues on packages, etc. purchased through their company - will be provided by The Travel Companion. This number will be promoted on all printed materials.

➜ The Travel Companion will promote enrollment in their monthly e-news distribution to FNBO customers in all printed materials. Customers must "opt-in" to receive the newsletter. This newsletter will feature travel specials and other travel items. FNBO names and e-mail addresses will not be sold.

➜ The Travel Companion will provide FNBO customers who book vacations through TTC with free, comprehensive travel destination information through Weissmann Travel Reports at the customers request.

➜ The Travel Companion will develop a new URL - no use of thetravelcompanion.org.

➜ The Travel Companion is willing to offer a **College Credit Card Spring Break 2003 Sweepstakes** and assist with the promotion - **more details to come.**
- ➜ November 2002 Account Management promotion.
- ➜ Customers would be eligible to win with each purchase they make with their College Credit Card during the month of December 2002.
- ➜ This will be promoted in the October 2002 College Credit Card DM acquisition promotion - Entry into the sweepstakes will be provided to new customers upon approval.
- ➜ Trip to be paid for by The Travel Companion.
- ➜ TTC will design and print all marketing materials within FNBO Branding Guidelines.
- ➜ Final approval will be provided by FNBO.
- ➜ FNBO will mail all marketing materials.
- ➜ FNBO will cover the postage for mailing materials to customers.
- ➜ Statement Messages - may be utilized in conjunction with coupon insertions if space is available during Dec and Jan.

# THE TRAVEL COMPANION
## AND
# FIRST NATIONAL BANK OMAHA
# PARTNERSHIP OPPORTUNITIES



**Sample Webpage - e-bags template.**