UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE TRAVEL COMPANION, LLC | : | CIVIL ACTION |
| | : | NO. 3:03 CV 0289(DJS) |
| VS. | : | |
| | : | |
| FIRST NATIONAL BANK OF OMAHA | : | |

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

As is reflected by plaintiff's response to defendant's Local Rule 56(a)(1) Statement, and plaintiff's own Local Rule 56(a)(2) Statement, there are a number of material facts in significant dispute that should preclude a summary judgment in this matter.

Contrary to the assertions of defendant, a reasonable jury could–and likely will-find that a contract was offered to the plaintiff, that the plaintiff signed and returned the contract, and that there was nothing further to be done at that point to effectuate a binding contractual arrangement between the parties. In short, offer, acceptance and consideration.

In addition, contrary to defendant's representations, a reasonable fact finder could-and likely will-find that there were, in fact, schedules that were agreed to by the parties, in writing, that satisfied the portion of the contract which provided for "executed schedules".

Because there is fundamental agreement over these operative facts, the legal claims advanced by defendant, which are predicated on the absence of a dispute of material facts, must fail.

### 1. **Standard for Determination of Summary Judgment**

The standard for determination of a summary judgment is well-settled.

> Although the basic principles for granting summary judgment are well-settled, the frequency of cases is which it is granted improvidently persuades us that these tenets bear repetition. Fed.4.Civ.P. 56(c) provides, in part, that summary judgment shall be rendered only when a review of the entire record demonstrates "that there is no genuine issue as to any material fact." The burden falls on the moving party to establish that no relevant facts are in dispute. Moreover, in determining whether a genuine issue has been raised, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Therefore, not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them.
>
> Properly employed, summary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial. It must, however, be used selectively to avoid trial by affidavit. Hence, the fundamental maxim remains that on a motion for summary judgment a court "cannot try issues of fact; it can only determine whether there are issues to be tried." As long as the plaintiff has adduced sufficient facts to substantiate the elements of his claim summary judgment is inappropriate.

Donahue v Windsor Locks Board of Fire Commissioners, 834 F.2d 54 at 57-58, (2d. Cir. 1987) (citations omitted)

It also bears repeating that:

> "...the trial court's task at the summary judgment motion stage of litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to decide them. Its duty, in short, is confined at this point to issue-finding, it does not extend to issue resolution." Gallo v Prudential Residential Servs. Ltd., F.3d 1219, 1224 (2d Cir. 1994); see Donahue v Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 57 (2d Cir. 1987) (holding that on a motion for summary judgment, the court

"cannot try issues of fact; it can only determine whether there are issues to be tried").

Davis v Lynbrook Police Department, 224 F. Supp. 2d 463 at 474, (E.D.N.Y. 2002)

## 2. Discussion

The facts on which defendant's legal claims which form the basis of its motion for summary judgment rely are as follows:

1.     The contract offered to TTC was an "agreement to agree" and not a contract which could be accepted by Doug Payette, TTC's principal; and

2.     Assuming that defendant's representatives had, in fact, offered TTC a contract, the contract was never effectuated because the "executed schedules" referred to in Section 1(a) were never "executed".

As has been documented by plaintiff's response to defendant's Local Rule 56(a)(1) Statement, and plaintiff's own Local Rule 56(a)(2) Statement, these "facts" are in dispute.

With respect to whether the document entitled "Marketing Agreement" submitted to TTC was an offer, which could be accepted, or an "agreement to agree", the following can be noted: After some months of collaboration, Mr. Payette of TTC had expressed concern to Allison Steen of FNB that he was doing work on the proposed project without a contract. As noted by Mr. Payette in his deposition (Tab 3), "at that particular point [July 9, 2002] I had told Allison that I could not do any further work on this project unless a contract is in my possession because she was starting to give me deadlines that needed to be met in order to proceed with the project. So

she had hurried along to get a contract done, and I guess on July 18, she forwarded an email saying, "here is your contract. Can you please get the work done now so we can proceed." Payette Deposition, (Tab 3) p. 49.

As indicated by Payette in his testimony, on July 18, 2002 an email was sent by Ms. Steen to him (Tab 5) which states, in part: "Doug, please see the attached contract. Let me know if you have any questions or changes. Will this allow you to send me the statement insert copies soon?...". Attached to the email was the "Marketing Agreement" (Tab 6).

Consistent with this documentation of an offer of a <u>contract</u>, not an "agreement to agree", is the testimony of the FNB representatives involved in the project. In her deposition (Tab 4), Allison Steen, the FNB representative with whom Payette was dealing in July of 2002, testified as follows:

> Q. ....is this an email that you sent him? [referring to the email of July 18, 2002]
> A. Yes.
> Q. and you attached a contract: is that correct?
> A. Yes.

Deposition of Allison Steen (Tab 4), p. 9.

Later in the deposition she testified as follows:

> Q. ...your letter of July...or email of July 18 never refers to a draft of an agreement or a discussion agreement. You intended to send him the agreement for him to sign off on; isn't that true?
> A. I don't remember.
> Q. All right. You sent him an agreement and he signed it and returned it, correct?
> A. Yes.

Deposition of Allison Steen, (Tab 4), p. 31.

In addition, contrary to the "facts" set out in the affidavit submitted with defendant's motion for summary judgment, Susan Tieger, the FNB executive who terminated the contract with TTC, testified under oath at deposition as follows:

> Q. Did you know it was going out to him, in other words?
> A. I knew they were in the process of working out the details of the process. I didn't know what specific day they were going to send it out or anything like that.
> Q. Was Allison authorized to send him the contract?
> A. Yes.
> Q. Are you aware he signed the contract without any changes at all?
> A. That's what I was told when she brought it in to me.
> Q. Are you aware that nowhere in her communications in writing to him when she sent him the contract did she express that this was a tentative or preliminary or draft contract?
> A. Am I aware? No.
> Q. All right. Would that surprise you?
> A. No.
> Q. <u>All right. So it was your understanding a contract was going out to him, not a discussion point contract or a preliminary document, correct?</u>
> A. <u>Correct</u> (emphasis supplied).

Deposition of Susan Tieger, (Tab 9), pp. 17-18.

Given the above, the overwhelming evidence substantiates plaintiff's claim that a contract was offered and accepted. The defendant's claim that what was offered was an "agreement to agree" is contradicted by the documentary evidence as well as the sworn testimony of its own representatives.

The second key fact upon which defendant's motion for summary judgment relies is the claims that the contract was not complete because it lacked the "executed schedules" referred to in Section 1(a).

The precise language in question in Section 1(a) of the "Marketing Agreement", (Tab 6), is as follows: "FNB desires to make certain travel and travel related services and benefits available to its cardholders and has selected Service Provider to provide such travel and travel-related services pursuant to executed schedules between the parties..."

What does "executed schedules" mean?

At a minimum, the meaning of "executed schedules" is ambiguous. "When there is ambiguity, we must construe contractual terms against the drafter." See ARB Construction, LLC v Pinney Construction Corporation, 75 Conn. App. 151 at 158 (2003), FN 3, citing Rund v Melillo, 63 Conn. App. 216 at 222 (2001). Therefore, "executed schedules" should be construed to encompass any writing documenting an agreed-to schedule, an interpretation consistent with the actual conduct of the parties.

As noted, the "Marketing Agreement" (Tab 6) specified three marketing activities: a statement insert, a direct mail solicitation, and a sweepstakes campaign. The contract itself provided that the sweepstakes campaign "...shall be conducted in 2002 with completion of the campaign in the first quarter of 2003." The Power Point presentation (Tab 11) that had been used by the parties to embody their discussions further specified that the statement insert test was to be done in October 2002 and the direct mail test promotion was to be also conducted in

October, 2002. These writings constituted the "executed" schedules that had been exchanged by the parties which set forth the timing of the three marketing activities the parties had agreed to relative to plaintiff's travel services.

As a footnote, it is ironic that defendant now makes the assertion that the contract was incomplete because the parties never exchanged "schedules". Allison Steen, who had forwarded the contract to the plaintiff, and who had arranged for it to be prepared at FNB, was herself unable to explain the meaning of the term "executed schedules" in the contract. See Steen Deposition (Tab 4) at pp. 20-21. Despite this, defendant now asserts that the contract was lacking specifics!

Defendant also cites case law to bolster its argument that "executed schedules" were required but had never been prepared. However, the case law to which defendant makes reference refers to <u>executed agreements</u>, not "executed schedules". No case law has been cited which holds that a "schedule" cannot be agreed to by the parties in a format other than by a document with signatures.

Defendant also argues that plaintiff cannot sustain a promissory estoppel claim as there was no "promise" made by defendant. This argument merely repackages the defendant's argument that the contract sent to TTC was an "agreement to agree". Given the dispute as to the operative facts, the attack on the promissory estoppel claim suffers from the same infirmities as the attack on the contractual claim: there <u>is</u> a genuine dispute as to whether, in fact, a contract was offered.

Likewise, the argument that the claim of a breach of the implied covenant of good faith and fair dealing cannot be successfully asserted rests on the defendant's incorrect assertion that there are no material facts in dispute as to whether a contractual agreement was reached. This argument must also, therefore, fail.

With respect to the CUPTA claim, defendant asserts that a breach of contract claim, without more, cannot form the basis of a valid CUPTA claim under Connecticut law.

In the Fourth Count of the Complaint, plaintiff has specifically pled that the conduct of the defendant was "immoral, oppressive and unscrupulous...". If proven, this conduct would, in fact, support a CUPTA claim based on the same cases cited by defendant in its memorandum of law.

As is reflected by plaintiff's Local Rule 56(a)(2) Statement, defendant never articulated any legitimate basis for its decision to terminate the contract with TTC. Susan Tieger of FNB, who had not previously been involved in the negotiations with TTC, merely told Mr. Payette, of TTC, that FNB did not wish to proceed with a contractual relationship. This decision was based upon information brought to her by her subordinate, Allison Steen. See Tieger Deposition (Tab 9), pp. 11-15; Steen Deposition (Tab 4), pp. 7-8. In essence, the information communicated to Tieger from Steen was that the plaintiff wasn't willing to meet his obligations under the contract with respect to paying for the costs of envelopes which would contain direct mail marketing advertisements. See Steen Deposition (at Tab 4), pp. 8-9 and 25-26. There was also information

given Teiger that Doug Payette, the principal of TTC, was "bipolar", "untrustworthy", "confused" and "flighty". See Tieger Deposition (Tab 9) at pp. 13-14.

It is entirely possible, if not probable, that a reasonable fact finder could determine that the actions of FNB in reaching an agreement with a vendor, and then unilaterally canceling it without any rational basis, constitutes conduct that is immoral, illegal, oppressive and unscrupulous. The CUPTA claim should be permitted to proceed.

> PLAINTIFF
> THE TRAVEL COMPANION, LLC.
>
> By_____
> Gerald S. Sack
> Sack, Spector & Karsten
> 836 Farmington Avenue
> West Hartford, CT  06119
> (860) 233-8251
> Federal Bar #ct05279

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed on this 29th day of April, 2004, to the following counsel of record:

R. Cornelius Danaher, Jr., Esq.
Calum B. Anderson, Esq.
Danaher, Tedford, Lagnese & Neal, P.C.
21 Oak Street
Hartford, CT 06106

Richard P. Jeffries, Esq.
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186

Clerk of the Court
United States District Court
450 Main Street
Hartford, CT 06103

_____
Gerald S. Sack